**NASHVILLIANS AGAINST I–440, et al.**

v.

**Andrew L. LEWIS, Jr., et al.**

**No. 80–3722.**

United States District Court,
M. D. Tennessee,
Nashville Division.

Sept. 23, 1981.

other FECA provisions against contributors to the Committee be made possible by record-

keeping pursuant to 2 U.S.C. § 432(c).

**964**

Larry Woods, Jinx S. Woods, Nashville, Tenn., for plaintiffs.

Hal Hardin, U.S. Atty., Aaron Wycoff, Asst. U.S. Atty., William Leech, Atty. Gen. for State of Tenn., Donald W. Schwendimann, Asst. Atty. Gen., Donald L. Corlew, Deputy Atty. Gen., Peter Curry and George Dean, Metro Legal Dept., Nashville, Tenn., for defendants.

## MEMORANDUM

MORTON, Chief Judge.

Plaintiff "Nashvillians Against I-440" is a nonprofit, unincorporated association comprised of members who joined together to voice their disapproval of and, if necessary, pursue litigation concerning the proposed construction of Interstate 440 (I-440) in and around Nashville, Tennessee. Acting individually and as members of this and other groups, the individual plaintiffs have endeavored to either delay or stop completion of the proposed project. Pursuit of these objectives culminated in the filing of this civil action on December 9, 1980. Defendants are federal, state and local governmental officials who have been responsible for the planning and development of the I-440 project.

## I. HISTORICAL BACKGROUND

Planning for the proposed highway began in excess of 25 years prior to initiation of this suit. It appears that the original proposals regarding location were formulated under the auspices of Policy and Procedure Memorandum 20-4 (PPM) issued by the U.S. Bureau of Public Roads, which is currently known as the Federal Highway Administration (FHWA). PPM 20-4 was issued on August 4, 1954. At least as early as March of 1955 a New York consulting firm, Clarke and Rapuano, was retained to aid in the process of planning the highway.

On August 10, 1955, proposed route locations for the highway were approved by the Nashville City and Davidson County Planning Commissions at a joint meeting. On September 23, 1955, the Bureau of Public Roads approved general locations for a network of interstate highways through and around Nashville. Final location approval was given by letter dated January 10, 1955, with I-440 designated at that time as Route 516.

Section 116 of the Federal-Aid Highway Act of 1956, 70 Stat. 374, added to the duties of responsible officials requirements for public hearings and the consideration of economic effects of the location of Federal-Aid Highway projects, if such projects involved bypassing or going through any city, town, or village. Pursuant to the administration of section 116, PPM 20-8 was issued by the Bureau of Public Roads on August 10, 1956. It allowed consideration of projects affecting several adjacent cities, towns, or villages in one combined public hearing, provided the hearing was reasonably convenient in terms of location and time to the citizens of all the affected cities, towns, and villages.

In accordance with the requirements of section 116, a public hearing was held on

May 15, 1957. This hearing was a combined hearing which included consideration of all the interstate projects in Davidson County. Specific descriptions were provided for both an inner loop and an outer loop. The outer loop is presently identified as I–440. In addition to the discussion of interstate routes, consideration was also given to the potential economic impact of locating the interstate system in Davidson County.

In a letter dated September 1, 1965, the Division Engineer for FHWA authorized a change in the programming status of the western section of I–440 from Stage 2 to Stage 1. This action allowed reallocation of federal monies to "be used on more urgent work," but retained the original date of authorization for studies and incidental costs in connection with the right-of-way acquisition for I–440 as July 12, 1961. It was agreed at that time and thereafter that the State of Tennessee would be authorized to proceed with the purchase of certain tracts, including the Tennessee Central Railroad right-of-way or other properties within the designated right-of-way if such action was in the public interest or would alleviate "hardship cases." September 1, 1965, was established as the date of eligibility for reimbursement on such acquisitions.

During 1966, agreement was reached between the State of Tennessee and the Tennessee Central Railroad for acquisition of railroad right-of-way to be used for construction of I–440 between I–40 west and I–65 south. The Tennessee Central Railroad right-of-way comprises the major portion of the proposed I–440 right-of-way. This acquisition was made final by May 24, 1968.

A public hearing concerning the design for the section of I–440 between I–24 and I–65 was held on July 10, 1968. Due notice of the hearing was given by publication in the *Nashville Banner*. On December 4, 1968, the Bureau of Public Roads authorized acquisition of the I–440 right-of-way for this section.

On March 28, 1969, an additional public hearing was held concerning the design for the section of I–440 between I–40 and I–65.

Again, due notice was given by publication. By letter on August 17, 1970, the Bureau of Public Roads authorized acquisition of the I–440 right-of-way for this section.

The National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852 (1970), currently codified at 42 U.S.C. § 4321 *et seq.*, became effective on January 1, 1970. Pursuant to interim guidelines for implementing NEPA issued by the FHWA, the I–440 project was reexamined. Officials of the State of Tennessee determined that under these guidelines an environmental impact statement (EIS) would not be required for I–440. John S. Logan, Jr., of the FHWA indicated his approval of this determination on January 14, 1971.

During 1973, suit was initiated by the National Wildlife Federation in an effort to prevent the FHWA from exempting projects from certain NEPA requirements. Pursuant to a consent judgment entered against defendants in that suit on July 23, 1973, the conclusion was reached that an EIS would be required prior to construction of I–440.

With respect to the history of the I–440 project, it may be said that up to the point at which it was determined that an EIS would be required, there is no creditable allegation entertained in this action that would touch upon misconduct of any sort by local, state, or federal officials. For all practical purposes, only a few relatively minor steps remained to be taken prior to the beginning of construction. The appearance of the need to prepare an EIS may be characterized, therefore, as a somewhat precipitous event.

## II. PREPARATION OF THE EIS

The Tennessee Department of Transportation (TDOT) formally initiated the preparation of an EIS by sending letters of initial coordination to federal agencies, state agencies, local officials, and interested organizations. This initial coordination letter, dated January 28, 1974, indicated that TDOT was beginning preparation of a draft environmental impact statement (DEIS) in accord-

ance with section 102(2)(C) of NEPA. During the fall and winter of 1975 meetings were held between TDOT staff members and the staff of the Metropolitan Planning Commission (MPC). The purpose of these meetings was to establish a cooperative working agreement between TDOT and the MPC for preparation of certain portions of the EIS. The MPC was requested by TDOT to study the effects generated by "build" and "no build" alternatives on the following categories of environmental concern:

(1) Land use impact;

(2) Economic impact;

(3) Sociological impact, including the impact upon ethnic and minority population areas; and

(4) Impact upon public services.

During 1975 and 1976 there was close coordination between the TDOT staff and the MPC staff as they worked to evaluate the environmental implications of both building and not building I–440.

Documents generated by the MPC staff reflect the conclusions (a) that the purposes of I–440 as a bypass around the downtown area and as a means for relieving congestion on the inner loop remain valid; and (b) that current traffic counts and MPC traffic projections for the year 1995 indicate that without I–440 critical levels of traffic congestion will result on the major street network within the I–440 corridor and, in particular, on the inner loop.

Five public meetings or workshops concerning the proposed project were held between January 29 and March 26, 1977. The overwhelming conclusion drawn from citizen input at the workshops was that the community unanimously perceived a problem with crosstown transportation in the southern part of Nashville. Analysis of the individual and group questionnaires filled out by those attending the workshops showed that there was no community support for making "no improvements" to solve transportation problems in the area. In fact, the "Summary of I–440 Community Workshops" compiled by TDOT discloses that "no one at any meeting recommended that no improvements for crosstown travel be made."

Several alternatives to the proposed construction of I–440 suggested by workshop participants were analyzed. A report published by TDOT in February 1978 discussed those alternatives analyzed but not recommended for further study at the design level of detail. Alternatives studied by TDOT but found to have a low potential for satisfying the crosstown travel demand for the southern portion of Nashville included the following:

(a) Use of Woodmont and Woodlawn as a one-way pair;

(b) Relocation of the interstate loop near the Williamson County line; and

(c) Transit Alternatives:

(1) Bus;

(2) Rail; and

(3) Dial-a-ride.

On the other hand, some alternatives which had undergone preliminary analysis were recommended for further development and study in the draft environmental impact statement. These were:

(1) I–440 with six through lanes and two to four auxiliary lanes where needed;

(2) A reduced facility freeway with four through lanes and auxiliary lanes where needed;

(3) A four-lane boulevard with at-grade, signalized intersections at major radial street junctions; and

(4) The "no-build" alternative, or not constructing the facility, coupled with implementation of the approved Major Route Plan, which includes proposals for widening crosstown streets.

In February 1978 the MPC completed a document entitled *An Analysis of the Boulevard Alternative for the I–440 Corridor.* This report contained the MPC analysis of the boulevard alternative, along with revisions and additions to the earlier MPC report, *An Analysis of I–440.* As was true in the 1976 MPC report, this analysis stressed the land use, economic, social and public service impacts of the alternative addressed.

On April 18, 1978, the Metropolitan Council passed a resolution endorsing the I-440 project. The resolution stated that the Council "hereby goes on record as requesting the state Department of Transportation to immediately begin construction on I-440. Further, the Metropolitan Council requests the Metropolitan Mayor to publicly endorse and support this project."

On June 19, 1978, FHWA advised TDOT that relevant areas of concern had been appropriately addressed and that the DEIS was approved for circulation. The DEIS was circulated to federal, state and local agencies, private organizations, and citizens on August 15, 1978.

Yet another public hearing on the proposed construction of I-440 was held on October 13, 14, and 16, 1978 (Friday, Saturday and Monday), at the Howard School Building in Nashville. On September 13, 1978, the first notice of the combined hearing was published in the *Nashville Banner* and *The Tennessean*. The notice included a description of the four alternatives studied to a design level of detail, arrangements for the conduct of the hearing, and other pertinent and required information. The second notice consisted of a three-page Sunday newspaper supplement purchased by TDOT. The notice appeared in *The Tennessean* on Sunday, October 8, 1978. The Sunday supplement described the date, time, and location of the hearing, procedural arrangements for the hearing, alternatives studied, and other information. In addition, the supplement summarized the development of the I-440 project, essentially summarized the content of the DEIS, and openly encouraged public participation in the planning process. Thus, aside from the requisite notice that a public hearing would be held, the supplement contained a wealth of information concerning the I-440 project that was of obvious public interest. The two notices made clear that, should any citizen wish to expand upon his or her comments at the hearing or be unable to attend at all, written submissions would be accepted at the hearing and at the office of TDOT counsel for approximately 2 weeks after the hearing, and that written comments would be weighed equally with oral statements.

On the first 2 days of the public hearing (Friday and Saturday, October 13 and 14, 1978), interested individuals, organizations, agencies, and officials were given the opportunity to make comments on a "first come, first served" sign-up basis. The sign-up list was maintained at the hearing location, and names were called for the speakers in the order they appeared on the list. On the third and final day of the public hearing (Monday, October 16, 1978), interested individuals, organizations, agencies and officials who had made prior appointments to speak were heard. An appointment to speak could be obtained by telephoning TDOT. All of the relevant scheduling details and hearing procedures were set forth clearly in the public notices regarding the hearing.

It appears that the DEIS was reviewed by a rather large number of agencies, municipal bodies, corporations, and individuals who commented thereupon. The record discloses comments from, among others:

Assistant Chief Counsel for Right-of-Way and Environmental Law, FHWA;

Director, Office of Environment and Safety, U. S. Department of Transportation (USDOT);

Assistant Director, Office of Review and Compliance for the Advisory Council on Historic Preservation;

Executive Director of the Tennessee Historical Commission;

Director of Water and Sewerage Services for the Metropolitan Government of Nashville and Davidson County;

Executive Director of the Metropolitan Development and Housing Agency;

City Manager of the City of Oak Hill;

Director of the Bureau of Waterways and Rail, TDOT;

Vice President and Chief Engineer, Nashville Gas Company;

Chief of the Planning and Appraisal Staff, Southern Region of the Federal Aviation Administration;

Environmental Planner for the Tennessee Wildlife Resources Agency;

General Manager for Facility Services, South Central Bell;

Director, Pollution Control, Metropolitan Government of Nashville and Davidson County;

State Conservationist for the Soil Conservation Service of the U. S. Department of Agriculture;

Executive Director of the Mid-Cumberland Council of Governments and Development District;

Acting Regional Engineer for the Federal Energy Regulatory Commission;

Mayor of the City of Belle Meade;

Regional Environmental Officer for Region IV of the U. S. Department of Health, Education and Welfare;

Acting Director of Environmental Planning for the Tennessee Valley Authority;

Deputy Assistant Secretary of the U. S. Department of the Interior;

Chief of the Metropolitan Fire Department;

Chief of Engineering for the Department of the Army;

Chief of the EIS Branch, Region IV of the U. S. Environmental Protection Agency (EPA);

Chief of EIS Review for Region IV of the EPA.

Even if those who participated in the public hearing were added to the list above, all who reviewed the DEIS would not be identified. The list does demonstrate rather clearly, however, that the DEIS was by no means "hidden under a bushel." If a "coverup" occurred, it was a massive coverup indeed. This is not to say that every evaluation of the DEIS showered it with unqualified praise, but rather to say that the responsible officials were exposed, and in fact exposed themselves, to an extremely broad range of scrutiny and offered a virtual multitude the opportunity to comment.

The response of EPA, issued on March 28, 1979, was that the DEIS "rated LO–1, i. e., no significant adverse environmental impacts expected and no additional information requested."

On April 26, 1979, a summary of DEIS replies and public hearing comments was sent to members of the Metropolitan Planning Organization Executive Board and the TDOT Project Review Committee. TDOT also requested that the MPC prepare responses to some of the comments received by TDOT. The MPC responses, as transmitted by Mary Ellen Vanderwilt, Principal Transportation Planner, to Robert H. Paslay, Planning Director, evidence absolutely no dissatisfaction on the part of MPC staff members with respect to various concerns that they had expressed earlier during the environmental study process. The Metropolitan Planning Organization Executive Board adopted a resolution calling for, among other things, submission of a Final Environmental Impact Statement (FEIS) "as expeditiously as possible." The resolution was approved unanimously.

TDOT and FHWA proceeded with development of the FEIS for the Four-Forty Parkway alternative. Several modifications or additions to the studies and discussion in the DEIS were made in the FEIS as a result of public input, agency input, new data or information made available to TDOT after circulation of the DEIS, the applicability of new federal guidelines, and completion of impact assessments required for the recommended alternative.

## III. THE APPROVAL PROCESS

The completed FEIS was sent to the FHWA Division Office on December 31, 1979. On January 3, 1980, the Division Office forwarded copies of the FEIS to the FHWA Regional Office in Atlanta. On January 7, 1980, the Regional Office forwarded copies of the FEIS to the Associate Administrator for Right-of-Way and Environment at USDOT in Washington. Upon request, copies of the FEIS were also sent to, among others, the president of a group called Citizens for Better Neighborhoods and counsel for plaintiffs in this cause.

On January 8, 1980, a mailgram sent jointly by Governor Lamar Alexander and Mayor Richard Fulton was received by Neil Goldschmidt, who was then the Secretary of

USDOT but who has since been succeeded by defendant Andrew L. Lewis, Jr. The mailgram expressed wholehearted support for the I–440 project, and urged the Secretary to "expedite approval of the project" if possible. On February 13, 1980, Secretary Goldschmidt responded by letter, thanking the Governor and Mayor and assuring them that the Department would "make every effort to expedite its review of the [FEIS] so that a decision can be made at an early date."

Despite his prior expressions of support, on July 3, 1980, Mayor Fulton requested that Secretary Goldschmidt delay making a final decision on the I–440 project for 30 days in order that his staff could "have sufficient time to carefully study alternatives to construction of this highway segment." The Mayor did not essentially alter his stance in support of the project; he stated that his request was "made only after much contemplation and with the understanding that it will in no way adversely affect the Department's thinking in regards to 440." The underlying reasons for seeking delay were identified as fiscal concerns, the prospect of a "court battle," and the need to study the process by which the I–440 project might be withdrawn and funds diverted to other transportation projects.[1] On July 11, 1980, Secretary Goldschmidt agreed to delay action upon the project.

On or about July 25, 1980, Associate Administrator Thomas Downs of the FHWA met with State and local officials and others in Mayor Fulton's office to discuss questions concerning the I–440 project. During this meeting, a question was raised regarding the effect of FEIS approval by USDOT upon availability of the withdrawal and transfer option. Mr. Downs gave his opinion concerning this option but qualified his response by emphasizing that he was "not counsel" for the FHWA, indicating

that he would be happy to obtain an opinion from chief counsel for his agency on this "technical issue." It appears that the inclusion of a caveat in the Associate Administrator's response was justified, since his response was erroneous in certain respects.

Mr. Downs wrote a letter to Mayor Fulton on August 2, 1980, as "a followup to our conversation of July 25 regarding requirements to repay Federal funds," in an effort to "clarify the general payback requirements." Whether Mr. Downs realized at that time that he had misstated certain of the requirements during the earlier meeting is not clear, but such a conclusion would obviously explain his clarification effort.

On August 4, 1980, Mayor Fulton withdrew his request for delay in approval of the FEIS. It appears that in writing this letter the Mayor may have relied to some extent upon a misunderstanding of the withdrawal and transfer requirements. Also, it appears that this letter was sent prior to receipt of Mr. Downs' letter of explanation. In any event, clarification on this point was not long in coming, and Mayor Fulton did not evidence any dissatisfaction upon discovering the misunderstanding. The court cannot determine precisely when Mayor Fulton received Mr. Downs' letter, but there is absolutely no basis upon which to conclude that he did not receive the explanation mailed on August 2 well in advance of FEIS approval by USDOT. Furthermore, the Acting Secretary of Transportation, William J. Beckham, Jr., wrote a letter explicitly referring to the Mayor's misunderstanding and correcting the same on August 29, 1980. This letter also informed Mayor Fulton that USDOT would proceed with making a decision upon the FEIS.

On August 14, 1980, a memorandum from the Assistant Secretary for Policy and International Affairs to the Federal Highway Administrator noted USDOT concurrence in

---

1. This procedure has been referred to throughout the pendency of this action and at trial as the "withdrawal and transfer" option or alternative and will be referred to as such in this memorandum. In view of the confusion generated by this procedure, at least in part due to

changes in the applicable guidelines while planning for I–440 was in progress, the court might itself hesitate to attempt a concise analysis of all that it entailed. Suffice it to say that much has been said by many concerning a process apparently understood by few.

the FEIS, subject to four conditions.[2] On September 18, 1980, the Chief of the Environmental Program Division informed the Regional Federal Highway Administrator in Atlanta regarding USDOT concurrence, attaching a determination of section 4(f) compliance [3] to the memorandum and stating that processing of the EIS in accordance with applicable guidelines could proceed. Formal approval of the FEIS as of September 19, 1980, was communicated to the FHWA Division Administrator in Nashville by memorandum on that date, and TDOT was notified of approval by letter on September 22, 1980.[4] TDOT began distribution of the FEIS to federal, state, and local agencies and to interested groups and citizens on September 26, 1980.

The EPA in Washington received the FEIS on September 29, 1980. Publication in the Federal Register concerning availability was published in the October 24, 1980, Federal Register and stated that the 30-day review period would run from October 17 to November 17, 1980.[5]

On October 3, 1980, the Deputy General Counsel for USDOT wrote Governor Alexander regarding the confusion that had arisen earlier concerning the withdrawal and transfer option,[6] offering to withdraw approval of the FEIS in order to allow the State to study that option further if it so desired. Governor Alexander did not request any such action by USDOT.

During review of the FEIS, EPA had raised some questions about the potential for future year violations of the National Ambient Air Quality Standards. In response to verbal inquiries by EPA officials, TDOT prepared a "Position Paper on the I-440 Air Quality Impact Analysis," dated November 20, 1980. A recalculation of some of the earlier reported concentration values for carbon monoxide is presented in this report. The new predictions were based upon use of the CALINE 3 line source model, which was not in general distribution at the time of preparation of the FEIS for I-440.[7]

Use of the CALINE 3 model indicated that the I-440 project would not result in any significant violation of the National Ambient Air Quality Standards for the study years 1985, 1995, and 2005. The "Position Paper" also confirmed the findings of the FEIS that, as compared to the "no-build" alternative, the proposed "build" al-

2. The conditions related to developing a transit and transportation system management plan; requiring an EIS prior to construction of any additional general traffic lanes (as opposed to lanes designed for mass transit) on I-440; considering extension of the proposed bikeway; and examining further the possible effects of I-440 upon the First Church of Christ Scientist, which is located near the right-of-way.

3. Section 4(f) requirements must be met when a project involves the use of land from certain properties of historic significance and are discussed in more detail below. The standards are codified at 49 U.S.C. § 1653(f) and 23 U.S.C. § 138, two statutes that contain practically identical wording. General references are made herein simply to "section 4(f)."

4. The letter also noted that the Assistant Secretary for Policy and International Affairs had concurred in approval of the EIS subject to the four conditions referred to above.

5. Apparently due to uncertainty regarding whether it would be appropriate for the review period to run from October 17 (as had been indicated by EPA) in view of the fact that publication did not occur until October 23, the

Division Administrator for FHWA notified TDOT that he would use October 24 as the beginning date and that no further action would be taken by FHWA prior to November 25, 1980. The review period was later extended to December 3, 1980.

6. *See* text accompanying note 1 *supra*.

7. It is the court's understanding that CALINE 3 and other air quality measurement "models" represent different programs or procedures by which the amount of pollution of various types in air can be calculated or predicted with the aid of computers. A more technical definition is not required here.

The FHWA made CALINE 3 available to state transportation agencies in April 1980. The FEIS was, of course, completed at least as early as December 1979. Despite the availability of CALINE 3, the FHWA's position at least as late as September 1980 was that use of this model was not "mandated," although its use was encouraged since it was thought to represent "a substantial improvement in accuracy and capability over CALINE 2." The CALINE 2 model was used in preparation of the FEIS.

ternative for I–440 would result in a general improvement of air quality in Nashville with respect to carbon monoxide and ozone, two pollutants for which the metropolitan area is presently in nonattainment status with respect to the National Ambient Air Quality Standards.

By letter dated December 3, 1980, EPA raised further questions about the air quality impact of the I–440 project.[8] TDOT followed the suggestions of EPA and recalculated carbon monoxide concentrations at certain locations using the EPA HIWAY–2 model. It was found that the HIWAY–2 and CALINE 3 models produced results that are very closely comparable. Updated calculations of future carbon monoxide concentrations using these two models indicated that the I–440 project would not contribute to any carbon monoxide concentrations in excess of the National Ambient Air Quality Standards. By letter dated March 26, 1981, the EPA Regional Administrator notified the FHWA Regional Administrator that the comments submitted by EPA regarding air quality information had been satisfactorily addressed.

During January 1981, TDOT submitted a document entitled "Re-evaluation of Transportation System Management Plan for Interstate Route 440 Corridor, Metropolitan Nashville and Davidson Co." This document was intended to address the four conditions to which USDOT concurrence in FHWA approval of the FEIS had been subject,[9] and was accepted as such. Upon forwarding this submission to the FHWA Regional Administrator in Atlanta, the

FHWA Division Administrator in Nashville added his assurance that "[a]ppropriate steps will be taken to assure compliance with the stated conditions throughout project development." All of this information was forwarded to the Director of the Office of Environmental Policy in Washington. The four conditions having been adequately addressed, approval was given on February 20, 1981, indicating that the responsible officials could advertise for bids on I–440 construction.

## IV. WITHDRAWAL AND TRANSFER

■ Plaintiffs have complained that approval of the I–440 project "should be rescinded since plaintiffs were deprived of the benefits and rights available under the interstate withdrawal and transfer of funds provisions of the Federal Highway Act." As an initial proposition, plaintiffs have not brought to the court's attention any authority, statutory or otherwise, that would tend to indicate that the Federal Highway Act contemplates any "rights" of this sort claimable by plaintiffs at all, and the court is unaware that any such authority exists. The statute upon which plaintiffs must rely in this respect provides that "[u]pon the joint request of a State Governor and the local governments concerned, the Secretary may withdraw his approval of any route or portion thereof on the Interstate System which [meets certain criteria]."[10] Even the most cursory review of this provision discloses that none of the officials referred to therein are obligated thereby to do anything at all, and plaintiffs would be and are

---

**8.** Despite the fact that FHWA was encouraging the use of CALINE 3, *see* note 7 *supra*, EPA apparently was not satisfied with that model. On December 3, 1980, the Regional Administrator for EPA Region IV communicated to TDOT the following:

> The Caline III Model used by TN–DOT has been recommended for inclusion in the 'Guideline on Air Quality Models', but is not presently approved for use. To avoid any further delay we suggest Tennessee DOT either recalculate the air quality impacts using an approved EPA model, e. g., Hiway–2, or recalculate the impacts using the Caline III Model with the [addition of certain] assumptions.

The response by TDOT to this recommendation, as indicated by a letter from the Environmental Planning Division Administrator for TDOT to the FHWA Division Administrator, was: "Although we are confident that our earlier calculations were adequate and in full accord with accepted scientific procedure, we have followed the EPA suggestion that concentrations be recalculated using the EPA HIWAY–II model."

**9.** *See* note 2 *supra* and accompanying text.

**10.** 23 U.S.C. § 103(e)(4) (Supp.1981).

a *fortiori* totally without a "right" to compel any act on the part of those officials by virtue of this section.

■ The confusion that attended efforts to interpret the withdrawal and transfer provisions is regrettable. Plaintiffs have pointed, in particular, to the fact that Mayor Fulton misunderstood these provisions as a basis upon which the court should strike approval of the entire I–440 project. The Mayor's misunderstanding was due, in part at least, to statements made by Thomas Downs. Three major faults eviscerate plaintiffs' contention even if the lack of authority that would support such action by the court could be ignored. First, Mr. Downs very carefully stated that he was "not counsel," and made perfectly clear to those present that he did not purport to render a definitive legal interpretation of the withdrawal and transfer rules.[11] Second, clarification of the withdrawal and substitution issue was sent to Mayor Fulton by letter on at least two occasions prior to approval of the FEIS.[12] Third, if Mayor Fulton has in fact been victimized, either by the machinations of federal officials or otherwise, it is he who should be heard to complain. Defendant Fulton's silence on this point might be said to resound. Plaintiffs have vigorously emphasized the fact that Mayor Fulton withdrew his request for a delay in approval of the FEIS at a time when he did not fully understand the withdrawal and transfer provisions. The court would underscore the fact that the initial request was only that USDOT "hold in abeyance a final decision" on the FEIS, and not that all procedures leading up to approval be halted. Whether this request was later withdrawn is totally irrelevant, since approval of the FEIS was not given in any event until 78 days after Mayor Fulton had made his request for a mere delay of 30 days.[13]

■ Plaintiffs complain that both the DEIS and FEIS are fatally defective because they failed to accurately explain in every detail the legal boundaries of the withdrawal and transfer option. Defendants concede that inaccuracies existed. The mistakes disclosed are not viewed by the court as such departures from standards of reasonableness and practicality, however, that the entire project should be delayed or abandoned as a result. *See Environmental Defense Fund v. TVA,* 492 F.2d 466, 468 n.1 (6th Cir. 1974). As for the DEIS, the court would only point out the obvious—that a draft is submitted in this context for the very purpose of allowing review and comment so that a corrected final statement may be prepared. Plaintiffs concede here, in fact, that the FEIS did correct all mistakes contained in the DEIS regarding the withdrawal and transfer issue. Nevertheless, the FEIS failed to discuss a change in the law that was made shortly before the FEIS was released, and plaintiffs describe this omission as "crucial." The relevant law was amended on November 9, 1979.[14] This amendment for the first time drew a distinction regarding the withdrawal and transfer option based upon whether the Secretary of Transportation had approved the FEIS for a project. Several reasons may be identified that indicate why failure

---

11. Plaintiffs can hardly contend that they are unaware of the context within which the much-ballyhooed statements were made. Mr. Downs first addressed the withdrawal and transfer issue in response to a question by plaintiff Eugene TeSelle, who was present at the meeting.

12. Mr. Downs wrote to clarify this issue approximately 47 days prior to approval of the FEIS. The Acting Secretary of Transportation wrote Mayor Fulton approximately 20 days prior to approval. The court is baffled by plaintiffs' assertion that "[t]he federal defendants . . . have made no sincere attempt to undo the damage caused by [Mr. Downs'] statements."

13. As a matter of fact, 32 days passed between the time that the request was made and withdrawn, and an additional 46 days passed between withdrawal of the request and approval of the FEIS. It is rather obvious that Mayor Fulton's actions of whatever nature had absolutely no practical impact upon the approval date. Had he, on the date he withdrew his request, asked instead that USDOT delay approval for 30 or even 45 additional days, the approval date need not have been affected.

14. *See* Pub.L.No.96–106, § 2, 93 Stat. 796 (amending 23 U.S.C. § 103).

to include this alteration in the law in the FEIS is not deemed "crucial" by the court.

The completed FEIS was delivered to the FHWA on December 31, 1979. Referred to as a unitary document, the FEIS is actually contained in three printed and bound volumes. Precisely when the research and drafting activities were completed is not clear, but it must be presumed that organizing and printing these volumes began well before their distribution during the latter part of December. In other words, there is no indication that TDOT could have been expected, as a purely practical matter, to incorporate such a change in the FEIS.[15]

Even if it is presumed that the November amendment could have been incorporated into the December document, as has been stated previously the court is aware of no "rights" due plaintiffs under the withdrawal and transfer provisions that might have suffered as a result of the omission.[16] All individuals who were affected by the amendment [17] were aware of its content at the appropriate time(s). It appears that plaintiffs would have the court require that an EIS be the equivalent of a completely accurate and updated legal treatise explaining concisely every point of law upon which it touches, regardless of the need or ability to do so. If this is indeed plaintiffs' contention, it is expressly rejected here.

Plaintiffs have contended that the actions by various officials discussed here have resulted in exposure of state and local governments, and ostensibly plaintiffs as well, to a substantial monetary "penalty" due to the requirement that funds not utilized for approved projects in accordance with federal guidelines must be repaid to the federal government. In light of conclusions discussed elsewhere in this memorandum, little need be said here regarding this contention. The court would note in passing, however, that it could not without a certain degree of conceptual difficulty characterize as a "penalty" the return of funds not spent in pursuit of the purpose for which they were granted. At the very least citizens, municipalities, and states remain completely free to seek funding from Congress for any worthwhile project. A failure to retain funds earmarked for use under the Federal-Aid Highways Act can hardly be said to foreclose access to federal funds.

Plaintiffs would have the court draw somewhat profound conclusions from the fact that a letter was sent to Governor Alexander offering to withdraw USDOT approval of the FEIS without any such letter being sent to Mayor Fulton.[18] The court views neither the letter nor the circumstances surrounding its dispatch as being sinister in any respect. Furthermore, there is absolutely no indication that the

---

**15.** Perhaps a better illustration that it would be impractical to expect incorporation by TDOT of a completely updated version of the withdrawal and transfer requirements in the FEIS is posed by the fact that USDOT itself did not publish proposed rules under the amended statute until November 20, 1980. *See* 45 Fed.Reg. 76,705 (1980). In addition, confusion with respect to the law on this point was evident on the part of federal, state, and local officials during the summer and fall of 1980. The fact that difficulties were encountered in attempting to interpret these standards approximately a year later may itself reinforce the impression that TDOT should not be condemned for failing to comprehensively address the issue in the FEIS.

**16.** The court would not entirely discount the prospect that political pressure might be exerted in order to bring about official action under the withdrawal and transfer provisions that could not be compelled by legal process. In that sense, it is conceded that a "benefit" might

be obtainable in plaintiffs' behalf by virtue of these provisions. The court finds here absolutely no subversion of plaintiffs' right to bring political pressure to bear, however. Thus, were it deemed advisable to construe plaintiffs' complaint in this light, the court would be inclined to hold nevertheless that plaintiffs have lost a battle over a controversial political issue, and not that they have been denied a right or benefit to which they are entitled as a matter of law.

**17.** In other words, the federal state and local governmental officials who could act under authority of the statute.

**18.** *See* text accompanying note 6 *supra*. Plaintiffs object in particular to the fact that the contents of the letter were not made known to Mayor Fulton, arguing that this evidenced bad faith and frustrated consideration of alternatives.

course of events would have, or for that matter could have, differed had Mayor Fulton received the same letter. First, the court would point out that it was perfectly logical to send a letter only to Governor Alexander since there is no indication that he had received any correspondence clarifying the withdrawal and transfer issue during the period within which Mayor Fulton received two such letters. Second, the court would state again that if Mayor Fulton has been victimized, he should be expected to complain. Finally, although plaintiffs broadly allege "an intentional act to avoid the Mayor's acceptance of defendants' offer to revoke approval," they offer absolutely no proof of such intent and completely overlook the fact that Mayor Fulton could not unilaterally withdraw the I–440 project under any circumstance whether or not approval of the FEIS was withdrawn. The statute quoted heretofore [19] clearly indicates that the Mayor *and* Governor must seek withdrawal of a project. Plaintiffs would have the court presume, at the very least: (1) that had Mayor Fulton received the letter he would have sought withdrawal of FEIS approval; (2) that he then would have decided that the entire project should be withdrawn; (3) that he would have succeeded in convincing Governor Alexander that the project should be withdrawn; and (4) that the Secretary of Transportation would have agreed with all of the above. Flying in the face of these theories, all of the responsible officials strenuously argue as defendants in this action that nothing is amiss.

When plaintiffs' arguments concerning the withdrawal and transfer issue are scrutinized closely, they simply disclose no merit. Those allegations masquerading as the strongest potential claims bear only upon conduct that supposedly resulted in wrongs against Mayor Fulton as the head of the local government. Plaintiffs are thus forced, in effect, to argue that the court should impose "relief" upon a party who seeks none.

## V. HISTORIC PROPERTIES

Plaintiffs have raised several issues concerning the relationship between the I–440 project and certain historic properties located within and near the proposed right-of-way. In particular, it is asserted that additional section 4(f) statements should have been prepared, that section 106 of the Historic Preservation Act has been violated, and that alternatives to the use of Granny White Pike have not been adequately considered.

### A. Section 4(f) Applicability

Defendants have argued that section 4(f) is by its own terms inapplicable to the I–440 project. This argument rests upon the fact that the statute applies only to projects approved after August 23, 1968.[20] The precise issue in this regard may be identified as what constitutes "approval" for purposes of section 4(f).

In *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), it does not appear that any question was raised concerning the applicability of section 4(f) to the use of park land for construction of I–40 in Memphis.[21] Nevertheless, the Court stated:

Although the route through the park was approved by the Bureau of Public Roads in 1956 and by the Federal Highway Administrator in 1966, the enactment of § 4(f) of the Department of Transportation Act prevented distribu-

---

**19.** *See* text accompanying note 10 *supra*.

**20.** The statute provides, in relevant part, as follows:

After August 23, 1968, the Secretary shall not approve any program or project which requires the use of . . . any land from an historic site of national, state, or local significance . . . unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such . . . historic site resulting from such use.
49 U.S.C. § 1653(f).

**21.** The issues in that case revolved instead around whether section 4(f) requirements had been met and the appropriate scope of judicial review when questions of compliance are raised.

tion of federal funds for the section of the highway designated to go through Overton Park until the Secretary of Transportation determined whether the requirements of § 4(f) had been met. Federal funding for the rest of the project was, however, available; and the state acquired a right-of-way on both sides of the park.

401 U.S. at 407, 91 S.Ct. at 819, 28 L.Ed.2d at 148 (footnotes omitted).

At first glance it would appear that defendants' contentions here are foreclosed by the above-quoted passage. It can hardly be denied that both the I–40 segment involved in *Overton Park* and the I–440 project developed along similar lines early on.[22] Closer examination of the *Overton Park* opinion might yield a different result, however. It is certainly arguable that the Court viewed expenditure of funds for right-of-way acquisition as the crucial time in determining whether a project has been "approved" for purposes of section 4(f). Such a conclusion might draw support, in particular, from the appearance that no approval had been given for acquisition of right-of-way to be used in building I–40 prior to the effective date of section 4(f).[23] However that might be, the court need not tread upon uncertain ground in view of the conclusions discussed below.

**B. Additional Section 4(f) Statements**

■ Plaintiffs have alleged that preparation of a section 4(f) statement dealing only with the impact of I–440 upon Granny White Pike represents a failure to comply with section 4(f).[24] They assert that the presence of additional historic areas near the I–440 right-of-way results in the need for delay of the project until section 4(f) statements are prepared and approved for these areas as well. All of plaintiffs' arguments upon this point share a common and somewhat understated theme—that "use" of historic properties under section 4(f) does not necessarily require use of the land upon which the properties are located. The court is unconvinced that section 4(f) supports this "constructive use" theory. Section 4(f) itself refers to protection "of the lands traversed," and provides that "the Secretary shall not approve any program or project which requires the use of ... any land from an historic site" except under certain circumstances.[25] Plaintiffs, on the other hand, are forced to argue that section 4(f) also applies with respect to property not "traversed" by I–440 and as to which no "use of ... any land" is contemplated.

Even accepting for purposes of argument and in deference to the general policy of section 4(f) the proposition that "constructive use" results in the imposition of duties upon the Secretary of Transportation under section 4(f), the court would not be inclined to hold that an obligation exists to prepare a section 4(f) statement for properties other than Granny White Pike. This conclusion is supportable in several ways.

The most straightforward basis upon which it can be shown that no additional section 4(f) statements should be prepared is found in 23 C.F.R. § 771.19(e). That regulation provides:

22. Both highways were originally planned as part of the National System of Interstate and Defense Highways. Also, since both were planned for locations in Tennessee, it may be presumed that TDOT played a similar role in the development of each project, and thus that similar courses of action were pursued.

23. *See* 401 U.S. at 407 & n.14, 91 S.Ct. at 819 & n.14, 28 L.Ed.2d at 148 & n.14. It appears in this case, on the other hand, that acquisition of right-of-way for the relevant part of I–440 was both approved and completed somewhat earlier. *Cf.* 23 C.F.R. § 771.19(e) (1980) ("[A] project may proceed without the preparation of a section 4(f) statement if the right-of-way from such 4(f)-type lands was acquired prior to

the designation" that qualifies them for protection under that section.).

24. As a technical matter, section 4(f) itself requires neither formal findings nor a "statement" at all. *See, e. g., Overton Park, supra.* Nevertheless, the Secretary of Transportation is required to review the impact of federally funded highway projects upon historic properties, and USDOT guidelines provide for documentation of this process through preparation of a "section 4(f) statement" in most cases. *See* 23 C.F.R. § 771.19 (1980).

25. 49 U.S.C. § 1653(f).

Park and recreation lands, wildlife and waterfowl refuges, and historic sites are sometimes designated or determined to be significant later in the development of a highway section. In such cases, a project may proceed without the preparation of a section 4(f) statement if the right-of-way from such 4(f)-type lands was acquired prior to the designation or change in significance.

Plaintiffs assert that this regulation does not apply here because the acquisition of right-of-way is not the "use" that calls section 4(f) into play.[26] Aside from the fact that the theoretical underpinnings for such an argument are weak, the court does not read the regulation itself as admitting such a distinction. The obligation to prepare a section 4(f) statement arises, if at all, only by virtue of USDOT regulations.[27] If the same regulations excuse the Secretary from any such obligation under circumstances such as are presented here, the court is unaware of any basis upon which it should purport to revive the duty.

Stretching the definition of "use" to perhaps its broadest extent, plaintiffs argue that noise, air pollution, land use alteration, damage from blasting activity, and property value diminution illustrate the uses to which various historic properties will be subjected. Neglecting momentarily the point that plaintiffs have not borne the burden of showing that these activities and results will actually impart the harm alleged,[28] the court would question the relevancy of certain of these effects. Surely the means by which constructive use of property can be shown for purposes of section 4(f) should at least include proof that the claimed harm will affect the *historic* value or quality of the properties.[29] The various historic districts addressed by this aspect of plaintiffs' complaint are designated as such because they encompass houses that are architecturally significant. The simple truth is that noise, land use changes, property value diminution, and to a substantial extent air pollution, will not affect the architectural integrity of these areas and will not impair their historic value.[30] Most of the cases cited by plaintiffs in support of the "constructive use" theory deal with parks and recreation areas or wilderness areas, rather than historic properties.[31] In those cases, the purposes for which such properties are protected were threatened by the "use." A case cited by plaintiffs that did involve an historic property held that an area contiguous to and essentially included within a larger historically significant property actually to be *traversed* by a highway should be protected.[32]

**26.** In making such an argument, plaintiffs implicitly recognize that they must endeavor to expand the "use" definition beyond the scope apparently contemplated by the statute and regulations promulgated thereunder. The court has expressed its view on this concept above. In any event, plaintiffs claim that "the construction and existence of the interstate" constitute a use separate and apart from the use addressed by the regulation.

**27.** *See* note 24 *supra.*

**28.** *See, e. g., Arkansas Community Org. for Reform Now v. Brinegar,* 398 F.Supp. 685, 692 (E.D.Ark.1975), *aff'd sub nom. Arkansas Community Org. for Reform Now v. Coleman,* 531 F.2d 864 (8th Cir. 1976).

**29.** It is obvious that characteristics of historic property quite apart from those that lend historic importance might bring satisfaction to the owner or increase the value of the property. The presence of such characteristics would not trigger the application of section 4(f), however,

and an impact upon only those characteristics should not do so either.

**30.** This is not to say necessarily that there will be no impact, but only that none will be encountered that differs in any real sense from the impact upon nonhistoric properties. The qualities protected by section 4(f), in other words, will be protected still.

**31.** *E. g., Monroe County Conservation Council v. Adams,* 566 F.2d 419 (2d Cir. 1977); *Brooks v. Volpe,* 460 F.2d 1193 (9th Cir. 1972); *Conservation Society v. Secretary,* 443 F.Supp. 1320 (D.Vt.1978).

**32.** *See Stop H–3 Assoc. v. Coleman,* 533 F.2d 434, 436 (9th Cir. 1976). It is conceded that dicta in *Stop H–3* might be cited in an effort to quarrel with the court's characterization of that case. As is evidenced elsewhere, however, the court would find a holding that relied only upon such dicta difficult to support.

Wholehearted acceptance of the "constructive use" principle would not on the facts presented in this case be the panacea that plaintiffs might expect.

Plaintiffs' allegations concerning "use" of the historic properties suffer from a fundamental deficiency in yet another respect. It is hinted that certain dire consequences *might* result from construction of I–440 without a showing that any will in fact be suffered. Plaintiffs would, in effect, suggest possibilities and have the court presume the worst manifestations of each. In contradiction to plans by defendants for depressing the highway below ground level, erecting barriers to alleviate noise, and controlling noise during construction, plaintiffs offer no showing that noise from the highway or its construction will be such that it will constitute "use" of historic properties. In contradiction to findings that air pollution levels will be reduced by removing "stop and go" traffic from neighborhood streets and allowing more efficient operation of motor vehicles, plaintiffs, although questioning the methodology employed in reaching those findings, offer no proof at all that air pollution will increase. Although construction planning has included consideration of precautionary regulations and the need to prevent damage from blasting during construction, plaintiffs have introduced evidence concerning only the obvious—that blasting "could result in adverse impacts" and "has the potential to destroy or alter properties." [33] Aside from failing to show that land use changes approach the inevitable,[34] plaintiffs have not even suggested how the court should determine that construction or use of the highway itself will result in "use" of any historic property by means of land use changes.[35] Although plaintiffs produced testimony that highway construction has a generally depressing effect upon property values, one of plaintiffs' witnesses and one of the plaintiffs testified more specifically regarding expected *increases* in property values.[36] The sum of the evidence simply provides no basis upon which the "use" of historic areas other than Granny White Pike may be found. It is entirely possible that plaintiffs have confused the standards that require treatment of a project under section 4(f) with those that require consideration of effects upon historic properties under section 106 of the Historic Preservation Act.[37] If that is indeed the case, the court has endeavored not to become likewise confused.

**33.** Plaintiffs can hardly deny that blasting of this type can be accomplished safely. The witness proffered by plaintiffs as an expert in this area at trial testified, in fact, that he has served as a consultant in a situation in which blasting was carried on "across the street" from an office building in downtown Nashville.

**34.** Indeed, plaintiffs are well aware that adverse land use impact might be avoided entirely. An "impact zoning" ordinance relating to I–440 was passed by the Metropolitan Council on the first of three readings required for enactment prior to trial, and passage on the second and third readings was anticipated by Mayor Fulton. Plaintiffs have relied thus far on the bare assertion that no such ordinance has in fact been finally enacted. Even ignoring the fact that action in the area of zoning has been undertaken, that such action may alleviate any possible harm from land use changes is in itself a telling fact.

**35.** Presence of the most stringent land use restrictions would not require design changes or alteration of planned uses for the highway; nor would a complete absence of any land use restrictions have any such impact. Land use control in this area is a distinctively local, and it might be said political, matter. Unhindered in any respect by I–440, local individuals and officials hold the key to determining the land use impact resulting from construction of that highway.

**36.** Plaintiffs recognize, as does the court, that property values and land use control may be closely related matters. However such a relationship might operate, plaintiffs have simply failed to adduce proof that either or both will result in a "use" of historic properties.

**37.** In fact, it appears that plaintiffs would have the court require a section 4(f) statement for every property included within the purview of section 106. Accepting such an argument would, of course, require that the definition of "use" of land be extended to include any "effect" upon land. Such an extension would essentially remove the need for the protection offered by section 106, since the standards under section 4(f) are palpably more stringent.

C. Section 106 of the Historic Preservation Act

■ As an alternative to the claim that additional section 4(f) statements should be required, plaintiffs allege violations of section 106 of the Historic Preservation Act.[38] That section and regulations promulgated thereunder[39] require consideration of the "effect" of projects upon property included in or eligible for inclusion in the National Register of Historic Places.[40] Section 106 also requires that the Advisory Council on Historic Preservation (ACHP) be allowed to comment on the project.

Investigations concerning historic properties began comparatively early in the planning process. The DEIS Appendix contained a report describing numerous properties of possible historic significance within the project area, and probable effects of all proposed alternatives were examined. Seventeen properties, including five districts, were identified by the State Historic Preservation Officer (SHPO) as meeting the criteria of the National Register.

During FEIS preparation, more intensive investigation was conducted with respect to these properties. The SHPO identified four properties that may be affected by I-440. Documentation of the significance of three of the properties was developed and submitted to the Keeper of the National Register for an official determination of eligibility pursuant to 36 C.F.R. § 63. Richland-West End Historic District had been listed previously in the Register, in April 1979. In December 1979, the Acting Keeper de-

termined that Granny White Pike and Grave, West End Heights Historic District, and Glen Oak Historic District were eligible for listing.

A reexamination of potential effects upon the identified properties was undertaken in light of design modifications[41] and several questions that had arisen at the intervening public hearing. The "criteria of adverse effect"[42] were applied in order to determine adverse effects upon those characteristics of the properties which made them eligible for listing in the National Register. The Richland-West End and West End Heights Historic Districts were found to be subject to increased pressures for redevelopment and more intensive land use due to the West End Avenue-Murphy Road interchange.[43] Granny White Pike would be adversely affected by the disturbance of 900 feet of its 6-mile length.[44] The setting of each of these properties would be altered by the presence of noise barriers, and Granny White Pike by the highway itself. It was found, on the other hand, that Glen Oak Historic District would actually benefit from the absence of some traffic that would otherwise use Blair Boulevard and Fairfax Avenue in order to cross the southern part of Nashville. Each of these effects is described in detail in the FEIS Appendix, with the concurrence of the SHPO included as well.[45]

In accordance with 36 C.F.R. § 800.13(b), a preliminary case report was prepared. Documentation of the "no adverse effect"

---

**38.** 16 U.S.C. § 470f.

**39.** *E. g.,* 36 C.F.R. §§ 800.1–.15 (1980).

**40.** The reach of inquiry under this section is obviously much broader than that required under section 4(f), although the standards applied are not as restrictive. The two may overlap to some extent since use of land, which triggers application of section 4(f), will also result in certain "effects." Neither requires as broad an examination as does preparation of an EIS, however. *See* 36 C.F.R. § 800.9 (1980).

**41.** Subsequent to release of the DEIS, for example, the I-440 interchange at Granny White Pike had been eliminated.

**42.** 36 C.F.R. § 800.3(b) (1980).

**43.** It was noted that "[t]hese pressures, if uncontrolled, could lead to the destruction or alteration of historic properties within the districts." It appears that plaintiffs would, again, ask that the court assume the inevitability of dire consequences, despite the clear qualification that damage should be expected only "if uncontrolled." *See* note 34 *supra.*

**44.** This impact, of course, triggered the need for compliance with section 4(f), which is addressed elsewhere.

**45.** Participation in this process by the SHPO is provided for in 36 C.F.R. § 800.5 (1980).

determination regarding Glen Oak was also prepared, in accordance with 36 C.F.R. § 800.13(a). Pursuant to 36 C.F.R. § 800.4, both reports were submitted to the ACHP for review, as well as to the U.S. Department of Housing and Urban Development, the U.S. Department of the Interior, the Tennessee Historical Commission and SHPO, Mayor Fulton, Vice-Mayor David Scobey, the MPC, the Metropolitan Historical Commission, and the Metropolitan Department of Public Works.

On November 7, 1979, the Southeastern representative for the ACHP came to Nashville to personally inspect the project site. He was provided with a summary of comments from interested groups and individuals, copies of those comments, and copies of letters concerning the involved properties. He also discussed the project and proposed mitigation measures with representatives from FHWA, TDOT, MPC, the Metropolitan Historical Commission, and the SHPO.

After reviewing all information presented, the ACHP concurred with the conclusions reached in the preliminary case report. A Memorandum of Agreement was drawn up and executed by the FHWA, the SHPO, and the Executive Director of the ACHP. Ratification of the Memorandum by the Chairman of the ACHP completed the process of compliance with section 106 and the applicable regulations.

Plaintiffs complain that the Belmont-Hillsboro Historic District, which is listed in the National Register, is entitled to protection under section 106. They allege that although Belmont-Hillsboro was not listed in the Register when the FEIS was prepared, defendants knew or should have known that it would be so listed. They point out that this area was not designated as an area to be affected by I-440. As a remedy, plaintiffs urge that the court require preparation of a supplemental EIS and enjoin further action by defendants regarding the project. In response to plaintiffs' emphasis of the fact that defendants knew or should have known that the Belmont-Hillsboro area was eligible for listing on the Register, a rather short answer may be given. The SHPO has indicated that this area was unidentified as requiring a determination of eligibility for the National Register not because it was deemed ineligible, but rather because it was considered to be outside the area of potential impact. *See* 36 C.F.R. § 800.2(*o*). It is alleged neither that this determination was made in bad faith nor that the SHPO was acting beyond the scope of his responsibility.[46]

Plaintiffs allege that the information provided and analysis undertaken pursuant to section 106 were "insufficient . . . to demonstrate that I-440 will not result in avoidable adverse effects to the historic districts studied." The court is somewhat puzzled by this contention. No issue is raised that was not considered pursuant to section 106, and no fact is proven that illustrates a greater impact than was contemplated. Whereas section 106 only requires that the ACHP be allowed "a reasonable opportunity to comment," plaintiffs have shown no respect in which such an opportunity was denied. Nor is there any allegation that the ACHP or its representative who personally inspected the project acted in bad faith. Simply stated, the procedures followed appear to have been normal in every respect.

---

**46.** *See* 36 C.F.R. § 800.4(a)(1)–(2) (1980). Even if it should be assumed that this determination was erroneous, there is absolutely no basis upon which to conclude that the Belmont-Hillsboro area is subject to any effect different from or greater than any of the areas addressed. Thus, the court would be extremely reluctant to grant the relief sought even without considering the fact that this District was listed in the National Register after preparation of the FEIS was completed. *Cf. South Hill Neighborhood Ass'n v. Romney*, 421 F.2d 454, 462 (6th Cir. 1969), *cert. denied*, 397 U.S. 1025, 90 S.Ct. 1261, 25 L.Ed.2d 534 (1970) (alternative holding) ("Rumors of buildings with historic significance is not enough to require . . . action. Placement on the Register is what is required."). *See also Neighborhood Development Corp. v. Advisory Council on Historic Preservation*, 632 F.2d 21, 24 n. 3 (6th Cir. 1980). Furthermore, it is not clear by any means that a supplemental EIS should ever be required under these or similar circumstances. Compliance with section 106 hardly requires the complications that accompany EIS preparation and approval.

D. Section 4(f) Statement for Granny White Pike

Plaintiffs allege that the section 4(f) statement for Granny White Pike fails to adequately consider alternatives to use of that historic property. Although this aspect of the claim is emphasized, plaintiffs would apparently argue that mitigation of effects upon Granny White Pike has also been inadequately addressed.

■ *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), sets forth the standards that guide review of a decision in this area. The court may "engage in a substantial inquiry" subject to the usual qualification that "the Secretary's decision is entitled to a presumption of regularity." *Id.* at 415, 91 S.Ct. at 823, 28 L.Ed.2d at 153. Initially, inquiry should be made into whether the Secretary acted within the scope of his authority and whether the decision reached can reasonably be said to fall within the scope of that authority. In addition, it should be determined that the decision was not reached arbitrarily, capriciously, as a result of abuse of discretion, or not in accordance with relevant law,[47] and that proper procedures were followed. No challenge is perceived in this action to the Secretary's authority or to whether the decision reached is within this authority. Indeed, such a challenge would be frivolous. There appears to be no question raised regarding the procedures followed. The sole issue to be considered here, then is whether the Secretary's actions comport with the "arbitrary and capricious" standard.

1. Alternatives to use of Granny White Pike

Whenever a proposed project involves use of land from an historic property, section 4(f) requires a determination by the Secretary of Transportation that "there is no feasible and prudent alternative to the use of such land."[48] Much verbiage can be avoided by merely stating here a fact that is obvious from the record and which plaintiffs (albeit reluctantly) must concede—*any* project undertaken to accomplish the major objective of I–440, which is to facilitate travel across South Nashville, will require use of Granny White Pike.[49] No alternative has been proposed by plaintiffs that would not use this property save the alternative of doing absolutely nothing. Likewise, no realistic alternative of such a type has been proposed by other individuals or groups.

■ Without engaging in detailed analysis of discussion that is present elsewhere in this memorandum,[50] the court would merely state that the Secretary did not act arbitrarily or capriciously in finding that no feasible and prudent alternative existed to use of land from Granny White Pike. The need to improve the ability to move traffic across South Nashville has been adequately documented and relevant information was made available to the Secretary. Plaintiffs offer no proof that this need does not exist.[51] They would ask, essentially, that the court find deficient the consideration of an

---

**47.** This finding is made by considering "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." 401 U.S. at 416, 91 S.Ct. at 823, 28 L.Ed.2d at 153.

**48.** 49 U.S.C. § 1653(f)(1).

**49.** Granny White Pike stretches in a southerly direction and continues into adjacent Williamson County. Thus any facility that runs in an east-west direction across the southern part of Davidson County will cross it. The "no-build" alternative to construction of I–440 would have involved widening existing streets that cross Granny White Pike, and would have necessitated use of that property, even though no interstate highway would have been built.

**50.** By addressing the sufficiency of the EIS, the court touches upon points relevant in this regard as well. Both the FEIS and the section 4(f) statement included therewith address the need to construct I–440 or a similar facility. The section 4(f) statement, in fact, includes references to the FEIS. The need to build such a facility and the need to use Granny White Pike are coextensive. *See* note 49 *supra*.

**51.** This is not to say that plaintiffs have not disagreed with the methods employed in determining the need for the project. Plaintiffs offer no proof that disputes the conclusions reached, however. In fact, the court is not cognizant of any serious claim by plaintiffs that no improvements whatsoever are needed. As a practical

alternative that appears, on the basis of the evidence presented, to totally lack viability.[52]

## 2. Mitigation of impact

The original design for I–440 included a "full interchange" at Granny White Pike. Building an interchange would have required substantial changes in the character of the Pike. In light of the historic nature of the site, such extensive alteration was eliminated from the design. The revised plan calls for depressing I–440 beneath the Pike, erecting noise barriers,[53] restoring the Pike as a two-lane facility[54] essentially identical in location to its present form, and landscaping the area in a manner consistent with other sections of the Pike. All of these facts, along with a discussion of two additional options that were considered for reduction of visual impact, were discussed in detail in the section 4(f) statement.

Plaintiffs allege that the planning outlined above "fails to consider extra measures to alleviate the damage to be inflicted," and that "[g]reater measures to minimize the harm were not even considered as options in the 4(f) statement." Two observations may be made regarding these claims. First, the absence of "options" is irrelevant in view of the fact that the Secretary is required only to approve or disapprove a plan, and not to choose between or express a preference for any one of various alternatives.[55] Second, despite allegations

that the plan to mitigate effects is inadequate, plaintiffs suggest absolutely no additional measures that are feasible and the court is aware of none. It is implied that no plans have been made for Granny White Pike that are not also to be effected in other areas. Aside from being of questionable relevance, that simply is not true.

■ The record supports the finding of the Secretary that plans for the use of land from Granny White Pike include all possible measures to lessen the effects of I–440 construction.[56] Plaintiffs have failed to contradict in any sense the presumption of regularity that accompanies this finding.

## VI. GOOD FAITH

■ As a prelude of sorts to a broad-based attack upon the adequacy of the EIS itself, plaintiffs allege that bias on the part of TDOT so permeated the process of EIS preparation that the standard of good faith objectivity has been breached. The sufficiency of the document itself is discussed hereafter. Nevertheless, the court recognizes the allegations of bad faith on the part of TDOT as assaults upon the integrity of the EIS. Various somewhat disjointed assertions have been made, the sum of which is proffered as evidence of bad faith. The court has endeavored to examine each in the appropriate context and accord each, in a manner of speaking, the attention that it deserves.

matter, they only disagree with the alternative chosen. *See, e. g.*, note 68 *infra*.

**52.** *Overton Park* indicates that "[t]he court is not empowered to substitute its judgment for that of the agency." 401 U.S. at 416, 91 S.Ct. at 823, 28 L.Ed.2d at 153. Even were the court so empowered the temptation to exercise that power would not be great here.

**53.** It is also expected that these barriers will reduce the visibility of I–440 from the Pike, although they will themselves intrude visually to a certain extent.

**54.** Five lanes would have been added in the area of the interchange if the original design had been retained. This would have been a drastic alteration indeed, since the historic value of Granny White Pike stems, for the most part, from the fact that it is one of very few

roads remaining that is still maintained in the old, two-lane, "pike" style.

**55.** *See Citizens to Preserve Overton Park, Inc. v. Brinegar*, 494 F.2d 1212, 1215 (6th Cir. 1974), *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975).

**56.** Abstract, total perfection can hardly be required, even assuming that it would be apparent. " 'Possible' must be interpreted within the bounds of wisdom and reasonableness." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 432 F.2d 1307, 1313 (6th Cir. 1970), *rev'd on other grounds*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). As has been noted, no additional measures have been suggested in this case for protection of Granny White Pike.

## A. Method of Consultation

Plaintiffs have produced testimony to the effect that TDOT official Ben Smith stated that criticisms and comments by MPC staff members concerning the EIS could be handled by informal meetings and telephone conferences rather than by formal memos or letters. This was communicated at least to witnesses Edward Cole and Mary Ellen Vanderwilt. Plaintiffs would have the court infer from this suggestion a devious motive, without consideration of an inference that the intent might have been to handle comments and criticisms more efficiently. It is not hinted in any respect that TDOT attempted by this means to suppress criticism; nor is it suggested that the flow of comments was to be in any manner altered other than in form. The role of TDOT to be examined here concerns the gathering and assembly of information. The methods chosen for accomplishing this task are, as a practical matter, of limited concern. In point of fact, it appears that the methods suggested by TDOT were rejected and that MPC personnel continued to draft memos and letters. The court views Mr. Smith's request at worst as a mere curiosity.[57]

## B. Traffic Forecasts and Consideration of Alternatives

The testimony of witnesses Cole and Vanderwilt also forms the foundation for claims by plaintiffs that the handling of traffic forecasts and alternatives suggested by the MPC evinced bad faith.

It is clear that the MPC and TDOT carried on over a period of time a dialogue the focus of which was an effort to reconcile and verify traffic projections in the I–440 impact area. The entry of uncertainty and perhaps disagreement into discussions concerning traffic projections for future years and even decades can hardly be unexpected. Upon the appearance that MPC staff members wished to consider various alternatives *sua sponte*, it is also understandable that a certain amount of confusion might result. In any event, allegations have been made concerning adjustment of traffic forecast figures by TDOT, alteration of maps or charts containing such figures at the suggestion of TDOT, consideration of whether origin and destination studies used to calculate traffic assignments should be updated, reliance upon traffic forecasts that were allegedly calculated with the assumption that I–440 would be built, documentation of forecasts, and consideration of mass transit alternatives. Plaintiffs conclude that these widespread charges substantiate their claims of bad faith. The evidence, including the testimony of Mr. Cole and Ms. Vanderwilt, supports no such conclusion.

The import of plaintiffs claims is that TDOT arbitrarily manipulated traffic figures and rebuffed attempts by MPC personnel to verify and comment upon the forecasting process or suggest alternatives. In contrast to these basic premises, Mr. Cole testified that when he spoke of TDOT requests that he "alter" traffic figures he did not intend to use that term in a "sinister" fashion and that he has no basis upon which to question the accuracy of the traffic figures. Also in contrast, Ms. Vanderwilt stated in an interagency memorandum on June 28, 1979, that "TDOT benefitted from the work and discussions with the MPC staff concerning methodology and assumptions for preparing the statewide traffic forecasts" while preparing the most recent traffic assignments.

---

57. All things considered, it may be said that certain of the opinions expressed at trial by present and former employees of the MPC may themselves be characterized as being of a somewhat curious nature. It appears that throughout the process addressed here the MPC made known its intention to comment freely, to the extent of publishing its opinion separately if the need should arise. By letter on December 5, 1975, for example, an MPC official informed Mr. Smith that "[a]lthough the [MPC] has the responsibility of analyzing several portions of the I–440 [EIS], it is in no way bound by the conclusions that [TDOT] draws from them." In view of this healthy and oft-expressed independence, it would be extremely difficult to find on these facts that TDOT, even had it been so inclined, could have stifled MPC criticism.

Ms. Vanderwilt, also in the June 28 memorandum, indicated that "[t]he discrepancy between the TDOT traffic assignments for the I–440 'build' and 'no build' alternatives used in the MPC staff analysis and used in the Draft EIS is the result of differences in traffic forecasting and assignment methodology." She went on to explain the differences in methodology, expressing no apparent dissatisfaction at that time. Mr. Cole testified that although he questioned the failure by TDOT to update origin and destination studies, "there is one legitimate school of thought that agrees with that conclusion." He noted that "there are other schools of thought" on this point. In addition, Mr. Cole admitted that diversity of opinion existed, by virtue of different "schools of thinking," with respect to future use of the automobile. This was another area in which he had criticized the findings of TDOT. However opinions might differ, it is clear that "[m]ere disagreement among experts will not serve to invalidate an EIS," *Kentucky ex rel. Beshear v. Alexander,* 655 F.2d 714, 720 (6th Cir. 1981) (citing *Life of the Land v. Brinegar,* 485 F.2d 460, 472–73 (9th Cir. 1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974)). It would appear that mere disagreement forms no stronger basis for a finding of "bad faith" such as would vitiate the EIS in this case.

Although Mr. Cole has questioned the extent to which TDOT considered mass transit usage, essentially suggesting that TDOT intentionally understated the viability of such an option, he admitted at trial that in considering this alternative TDOT actually skewed the figures so that they exaggerated the usage of mass transit that might be expected. Such an approach by TDOT would hardly be consistent with the bad faith that is alleged.

Ms. Vanderwilt testified, in effect, that TDOT attempted to severely limit the scope of inquiry undertaken by the MPC. Nevertheless, in the memorandum in which she summarized MPC staff responses to comments regarding the DEIS, Ms. Vanderwilt indicated that aside from the responses requested by TDOT, "[i]n addition, with the permission of TDOT, the MPC staff has prepared responses to several comments which were not identified as our responsibility but for which this agency determined that an MPC staff response was appropriate." In particular, Ms. Vanderwilt has stated "that TDOT was limiting the types of alternatives available to satisfy travel needs and community desires." She cited in her testimony a letter by Ben Smith of TDOT to Ora Adams of the MPC in which Mr. Smith expressed "some serious reservations about the manner in which the [MPC] staff appears to be approaching the formulation and evaluation of alternatives." Two paragraphs from the same letter quickly dispel any insinuation that TDOT was in bad faith attempting to hinder consideration of alternatives. There Mr. Smith explained his "serious reservations" as follows:

On the last page of the scope of work which you submitted to me, you implied that a consensus of the [MPC] staff need only be reached to initiate a rigorous environmental assessment of other alternatives by the State. This is not how the established decision-making process is set up to operate.

When other alternatives are generated by the [MPC] staff, those alternatives will be reviewed by [TDOT's] Project Review Committee to determine if they can be considered "reasonable alternatives." *Federal Highway Program Manual,* Volume 7, Chapter 7, Section 2, Paragraph 19J(1) requires that only "reasonable alternatives" be studied in detail. If the other alternatives continued to be questioned by the [MPC] staff, the matter would be resolved finally by a decision of the 3–C Policy Committee.

Far from indicating bad faith, the passage quoted and the letter as a whole illustrate an attempt by TDOT to coordinate and carry on in an efficient manner the highly technical and difficult task of preparing an EIS. "The agency charged with drafting an EIS must make the initial determination which alternatives are feasible and merit consideration." *Kentucky ex rel. Beshear*

v. *Alexander, supra*, at 718. TDOT had the job of coordinating the entire project of EIS preparation under FHWA guidance. However much MPC personnel might have wished to emphasize their role, they simply did not in this case bear the weight of responsibility borne by TDOT. The court will not condemn TDOT for attempting to perform a cumbersome task in an efficient manner. If in the course of this attempt certain individuals' feelings were hurt, so be it.

Plaintiffs' intimations that TDOT in bad faith premised traffic assignments for the "no-build" alternative only upon land use data that assumed the existence of I–440, based for the most part on testimony by Ms. Vanderwilt, must be viewed in light of the record as mere sleight of hand. Ms. Vanderwilt's testimony carefully indicated that traffic "forecasts were initially based on land use data that assumed that I–440 would be built" and pointed to "An Analysis of I–440" as showing that questionable traffic figures were prepared, with no mention of the fact that the forecasts were later revised.[58] Again quoting somewhat selectively from Mr. Smith's letter of January 22, 1976, Ms. Vanderwilt mentioned his statement that TDOT had "decided that the only proper basis for traffic assignments to the 'build' alternative must be the present adopted land use policy plan." On this basis the inference is offered that traffic assignments for the "no-build" alternative as well were based solely upon the land use

plan which assumed the existence of I–440. Near the conclusion of his letter, however, Mr. Smith stated: "We feel that the information provided ... should allow you to begin speedy preparation of *a 'no-build' land use plan assumption. While this assumption is being awaited by our Department for use in preparing 'no-build' traffic assignments,* we will expedite the revision of 'build' traffic assignments ...." (Emphasis added.)[59] It is obvious that only the traffic projections for the "build" alternative were to be prepared using the adopted land use plan. Plaintiffs do not question that use, and it appears only logical. The single apparent reason that TDOT "initially" used land use data that assumed the existence of I–440 is that no other land use plan had been produced by the MPC and adopted in accordance with applicable procedures. TDOT was forced to wait for preparation of revised land use assumptions by the MPC prior to revising traffic figures for the "no-build" alternative. Such facts are thin reeds indeed upon which to found a claim of bad faith on the part of TDOT.

## C. Air Quality Projections

Plaintiffs claim that the conduct of TDOT with respect to air quality predictions illustrated bad faith. The primary basis upon which this claim rests appears to be that TDOT did not respond to or consult with Paul Bontrager to the extent that he would have liked. Mr. Bontrager is the

---

**58.** During February 1978, the MPC released "An Analysis of the 'Boulevard' Alternative for the I–440 Corridor." This document was identified as a supplement to "An Analysis of I–440," which was released in September 1976. Among other things, the supplement states: "Figure 5 in this study illustrates the revised analysis of the traffic impacts directly resulting from not building I–440. This figure is intended to supersede Figures 9 and 11 in the 1976 MPC report." In view of this and other information contained in the 1978 supplement, the testimony referring to the 1976 study is essentially irrelevant, if not disingenuous.

Reference has been made previously to a memorandum authored by Ms. Vanderwilt on June 28, 1979, in which she rationalized the differing traffic figures contained in the DEIS and in "the MPC staff analysis." As was point-

ed out previously, she expressed no dissatisfaction at that time with the TDOT figures.

**59.** The quoted statement and various other parts of the record illustrate the fact that TDOT and the MPC constantly shared information of various types. It does not appear that TDOT at any time failed or refused to provide information that MPC staff members *needed* in order to carry out their assigned tasks. Beyond this, TDOT had essentially no obligation to the MPC. This was a cooperative venture engaged in by both agencies, but it was one for which TDOT, under the guidance of FHWA, bore substantial responsibility. In other words, the MPC was not cast in a supervisory role. That TDOT might have neglected to provide information in satisfaction of curiosity on the part of individual MPC staff members is of little moment.

Director of Pollution Control for the Metropolitan Health Department, and as such he is responsible for development of the Metropolitan Nashville and Davidson County State Implementation Plan (SIP).[60] In the absence of any obligation on the part of TDOT to more heavily involve Mr. Bontrager and his agency in the EIS preparation process, plaintiffs' claims disclose little or nothing of relevance.

Mr. Bontrager's testimony reveals that neither he nor his agency actually participated in any of the air quality studies performed by TDOT.[61] Furthermore, he stated that "[s]ubsequent to the time when FHWA was actually developing the air quality sections of the I–440 EIS, my department has not actively communicated with TDOT regarding I–440." Nevertheless, Mr. Bontrager complained that "TDOT has never satisfactorily responded to my requests for documentation of their numbers and assumptions and for an explanation of their assumptions and analysis." It can hardly be said that Mr. Bontrager's responsibilities with respect to the SIP were affected, since he stated that "a determination of consistency with the SIP is unnecessary for I–440." He expressed concern nevertheless "about meeting Metro's goals and objectives under the SIP." Precisely how TDOT has undertaken or is chargeable with any responsibility to aid Mr. Bontrager in the performance of his job has never been made clear. Aside from the amount of effort expended in preparation of the DEIS and FEIS, as has been discussed previously TDOT recalculated air quality predictions on two separate occasions subsequent to completion of the FEIS at the request of EPA. That TDOT responded readily to EPA may itself dispel the notion that TDOT was acting in bad faith in preparing air quality predictions. That TDOT

responded more readily to EPA than to Mr. Bontrager may well illustrate no more than allocation of priorities.

In his testimony Mr. Bontrager recalled a conversation with Ben Smith in which Mr. Smith said, in effect, that he would not tell Mr. Bontrager how to do his job and would appreciate it if Mr. Bontrager did not tell him how to do his. The content of the conversation as a whole is not presented in the record; nor is it clear whether the comment was made viciously, sarcastically, jokingly, or for that matter appropriately. Suffice it to say that neither Mr. Smith's remark nor the assertions discussed above approach rebuttal of the presumption that TDOT acted in good faith.

### D. Predisposition and Financial Interest

It is alleged that predisposition toward building I–440 and pecuniary interest on the part of TDOT evidence bad faith. Plaintiffs beckon from a hall of mirrors where the short appear tall, the thin fat, the solemn grotesque, and the ordinary spectacular.

Plaintiffs point to the fact that TDOT developed comprehensive plans, chose a route, and purchased right-of-way prior to preparation of the EIS. It is argued that these acts represent examples of bad faith. The court has previously outlined in some detail the course of planning for I–440 prior to the time when NEPA was enacted and prior to the time when it was learned that an EIS would, in fact, be required before construction could begin. It appears that TDOT conducted every activity discussed in accordance with all laws and regulations in force at the time each step was undertaken, and plaintiffs present no evidence to the contrary. That plaintiffs now urge a finding of bad faith based on these actions is

---

**60.** This plan is prepared statewide pursuant to the Clean Air Act, 42 U.S.C. § 7401 *et seq.*

**61.** The Metropolitan Health Department routinely collects data at various sampling stations. Some of this data was made available to TDOT. Mr. Bontrager stated, however, that he had "no personal knowledge as to how Metro Health's air quality data was used by TDOT,"

that "[n]either [he] nor anyone else at Metro Health ... assisted in TDOT's sampling or air pollution level collection studies," and that "no one from Metro Health ever confirmed TDOT's methodology or verified any figures used by TDOT in the methodology connected with the air quality studies for I–440."

tantamount to a plea for *ex post facto* condemnation. As such, the plea is rejected.

It is emphasized that federal funds for construction of I–440 are included in the budget for TDOT, and on that basis that the agency has been tainted by a financial interest in the project. Plaintiffs' argument proves far too much. Viewed from this perspective, government will always have a financial interest in governing. Every action may be said to require funding, and in the same sense a decision not to act will reduce the need for funds. To say that TDOT cannot perform an important task for which it is responsible without the necessary funding and that if it does not perform the task no funding will be needed merely states facts from which no conclusion can be drawn.[62] The potential impact upon TDOT's budget reflects no more than this. Plaintiffs' argument suffers another critical defect. It presumes that TDOT was in a position to control by its own volition the flow of federal funds for this project, essentially attributing to TDOT more power than that agency possessed. Plaintiffs would overlook the long and arduous efforts required in order to satisfy applicable federal guidelines and obtain approval of an EIS. They would overlook the fact that although TDOT performed a large part of the "legwork" and coordination of functions it was FHWA, a federal agency, that was ultimately responsible. Preparation of an EIS is not an end unto itself in any event, but absent significant involvement on the part of an appropriate federal agency in a supervisory role, the entire process would be suspect. Federal officials have been required at every stage to make crucial decisions. TDOT quite simply lacks the ability to manipulate federal funding for I–440 in the manner that plaintiffs suggest; the record is replete with evidence that FHWA carefully and appropriately supervised preparation of the EIS.

Various additional allegations are loosely grasped and slung by plaintiffs, but all melt away when exposed individually to light. Plaintiffs have objected to the Sunday supplement published in *The Tennessean* during October 1978, paid for by TDOT to advertise the 3-day hearing and inform the public concerning plans for I–440. Witness Paul Allen pointed to maintenance by TDOT of a large map of the project area as evidence of "bias." The map was updated so that Allen, as Director of Information for TDOT, could keep members of the press corps abreast of developing plans for I–440. There is no suggestion that any information contained in the newspaper supplement or on the map was inaccurate, misleading, or false. If voluntarily providing accurate information to the public concerning proposed action represents bad faith, citizens should welcome a plague of the same strain issuing from all governmental agencies.

■ The basic thrust of plaintiffs' arguments regarding alleged bad faith necessarily revolves around the fact that TDOT planned and proposed the highway prior to learning that an EIS would be required.[63] This is not a particularly striking case in that respect. Passage of NEPA did not automatically stop and erase from memory all projects in progress at the time; by its own terms that Act required abandonment

---

**62.** Clearly distinguishable are cases in which governmental officials or others have stepped outside the scope of their normal responsibilities in such a manner that an inappropriate pecuniary interest might be present. *See, e. g., Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Ward v. City of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). *Cf. Life of the Land v. Brinegar*, 485 F.2d 460 (9th Cir. 1973) (even though private firm had an apparent financial interest in approval of project, neither NEPA nor relevant case law prohibited the firm from assisting in EIS preparation).

**63.** Ultimately, plaintiffs would tangle TDOT in a classic "catch-22." An EIS can hardly be prepared without extensive advance planning, yet plaintiffs would point to such planning as a fatal defect. Likewise, plaintiffs decry on the one hand an "assumption" that I–440 will be built, although they vilify TDOT for an alleged failure to engage in continuing, cooperative, and comprehensive planning for the future on the other hand.

of nothing.[64] It merely added safeguards to the decisional process. It is true that TDOT had practically completed a plan for the highway prior to preparation of an EIS. Thus, certain of plaintiffs' allegations have a flavor that, if not properly distilled, might be misleading. The perceptive distinction drawn by other courts and appropriate here is that NEPA requires good faith objectivity rather than subjective impartiality. *Carolina Environmental Study Group v. United States*, 510 F.2d 796, 801 (D.C.Cir.1975); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 470 F.2d 289, 296 (8th Cir. 1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973); *Life of the Land v. Brinegar*, 485 F.2d 460, 467 (9th Cir. 1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Fayetteville Area Chamber of Commerce v. Volpe*, 515 F.2d 1021, 1026 (4th Cir.), *cert. denied sub nom. Interstate 95 Comm. v. Coleman*, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 140 (1975); *Mid-Shiawassee County Concerned Citizens v. Train*, 408 F.Supp. 650, 655 (E.D. Mich.1976), *aff'd*, 559 F.2d 1220 (6th Cir. 1977). TDOT has gathered a tremendous body of evidence concerning the need for I–440 or a similar facility. Evidence, if relevant, is by its very nature prejudicial. Plaintiffs dispute the proposition that I–440 should be built and they castigate TDOT here at every turn. Nevertheless, their disagreement shows nothing of bad faith; virtue does not necessarily accompany vituperation. A simple fact relied upon by defendants and not tarnished by plaintiffs nor actually challenged by them is that a genuine need exists.

Upon careful review of the record the court is of the opinion that TDOT has fulfilled its obligations forthrightly and in objective good faith. Scrutiny of the EIS itself only supports this conclusion.

## VII.  ADEQUACY OF THE EIS

██   Plaintiffs assert generally that the EIS does not contain adequate information and analysis such as would demonstrate that action on the proposed project "follows a fully informed and well-considered decision." They allege "various inadequacies in numerous sections of the EIS," which are addressed below.

### A.  Consideration of Alternatives

Plaintiffs complain that the EIS fails to satisfy NEPA requirements by not adequately discussing alternatives to construction of I–440. In particular, the alternative that defendants allegedly overlooked or intentionally deleted was a "no action" alternative.[65]

NEPA requires "a detailed statement by the responsible official on ... alternatives to the proposed action." 42 U.S.C. § 4332(C). Construing this passage, the Supreme Court has stated:

> To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility. . . . Common sense also teaches us that the "detailed statement of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every pos-

---

**64.**  *See, e. g., Environmental Defense Fund v. Corps of Engineers*, 470 F.2d 289 (8th Cir. 1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973).

**65.**  Plaintiffs have also made vague references in their discussion of this contention to a "withdrawal and transfer alternative." Some of these references make it appear that they suggest this as a separate "alternative" (as that term is used in section 4332(C)) that should have been addressed in the EIS. Withdrawal and transfer as a matter of discretionary fund allocation has been discussed previously in this memorandum and was discussed in the EIS. No evidence suggests that there has ever been an identifiable course of action proposed under such a label, however, and plaintiffs do not articulate the makeup of such an "alternative" here. The court therefore has no choice but to conclude that mention in this context of a "withdrawal and transfer alternative" is merely a parallel reference to the alternative of not building I–440.

sible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460, 484 (1978). The viability and reasonableness of this interpretation is hardly to be questioned here; nevertheless, plaintiffs would apparently argue that it does not relieve defendants from an obligation to discuss in more detail a "do nothing" alternative regardless of the fact that such a discussion might be "an exercise in frivolous boilerplate."

A "do nothing" alternative is, in fact, discussed in the FEIS, but that document also explicitly discloses that "a true Do-Nothing alternative was determined not to be a reasonable alternative." [66] The FEIS examined in more detail a "no build" alternative which involved not building I–440, but plaintiffs argue that since that alternative anticipated improvements to existing streets in South Nashville it does not represent a "no action" plan. Plaintiffs basically rely upon 40 C.F.R. § 1502.14(d), which calls for inclusion of "the alternative of no action." That section provides in addition, however, that the responsible agency should "[r]igorously explore and objectively evaluate all *reasonable* alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (emphasis added). Plaintiffs point to an informational memorandum published by the Council on Environmental Quality (CEQ) which states that "it is difficult to think of a situation where it would not be appropriate to address a 'no action' alternative." 46 Fed.Reg. 18026, 18027 (1981). Nevertheless, in the same memorandum CEQ recognizes that

[w]here a choice of "no action" by the agency would result in predictable actions by others, this consequence of the "no action" alternative should be included in the analysis. For example, if denial of permission to build a railroad to a facility would lead to construction of a road and increased truck traffic, the EIS should analyze the consequence of the "no action" alternative.

46 Fed.Reg. at 18027.[67] The obvious implication flowing from the latter passage is that where, as here, a decision not to build a major highway will result in an outstanding need to improve existing city streets, the consequences of actions relieving that need should be addressed. The "no build" alternative does nothing more than that.

Plaintiffs do not claim that a "no action" alternative, as they would define it, is reasonable. They deride the treatment of this alternative in the FEIS, however, and would apparently have the court look only to the "four corners" of the EIS in determining whether the alternative was sufficiently treated. The court recognizes no such limitation, if plaintiffs would in fact seek its imposition. The Sixth Circuit has recently indicated that

where potential alternatives are not discussed in detail in the EIS because they are not feasible, the evidence of infeasability need not be found within the EIS itself. Rather a court may look at the administrative record as a whole to see whether an alternative deserved greater attention in the EIS.

*Kentucky ex rel. Beshear, supra,* at 719. None of the various studies that have been conducted support in any respect the proposition that taking no action would be reasonable under the circumstances presented here. Plaintiffs would require extensive analysis of

---

**66.** Among other things, the FEIS indicates that taking no action would result in significant traffic overloads on existing routes. On five specified crosstown street segments, for example, traffic projections for 1995 indicate overloads ranging from 95% to 177% over capacity.

**67.** In other respects, the CEQ memorandum presumes that a "no-action" alternative is "reasonable." As has been indicated, a plan that included no action at all in the event of a decision not to build I–440 would not appear to lie easily with such a presumption.

such an alternative on the basis of 40 C.F.R. § 1502.14(d) without consideration of the seemingly desperate need for some improvement in the movement of crosstown traffic. Whereas the "no action" alternative is intended to provide a "benchmark" by which other proposals may be evaluated, plaintiffs are left to insist upon painstaking development of a "benchmark" that would be inaccurate, if not totally meaningless. The court is of the opinion that consideration of the "no build" and the "do nothing" alternatives in the EIS for I–440 satisfies the requirements of NEPA and guidelines promulgated thereunder. The *Beshear* court noted that

> [t]he agency charged with drafting an EIS must make the initial determination which alternatives are feasible and merit consideration. Clearly then, "[t]he specificity of EIS treatment of alternatives is a matter of agency discretion." Accordingly, this Court may only inquire whether the [responsible agency's] consideration of [alternatives] was so inadequate as to be an abuse of this discretion.

*Kentucky ex rel. Beshear, supra,* at 718. There is no basis upon which to find an abuse of discretion here.[68] Plaintiffs have raised no alternative not discussed in the FEIS, and the court finds that no reasonable alternative was slighted.

### B. Traffic Count Data

To a great extent, plaintiffs' claim regarding alleged inadequate treatment of traffic projections in the EIS rests upon their allegations of bad faith in the preparation of traffic data. In that respect, the claim is not well founded; that plaintiffs have identified experts who would question the methodology employed proves nothing of importance. Indeed, probably no EIS could survive a standard that required unanimous agreement among experts in any field.

Edward Cole subscribed to different "schools of thought" on certain points; Mary Ellen Vanderwilt found that differing figures were "the result of differences in traffic forecasting and assignment methodology." Plaintiffs have given absolutely no indication that those responsible for the EIS abused their discretion by relying upon the studies actually conducted. They offer only the bare assertions of various witnesses that they "would question" the methodologies used. Furthermore, *no evidence* is produced tending to show that the conclusions reached are erroneous.[69] The findings in the EIS must be accepted unless found to be arbitrary. Since reasonable persons could rely on the methodology employed in reaching the conclusions and since the conclusions themselves appear to be sound, they are not arbitrary. *See Kentucky ex rel. Beshear, supra,* at 720.

Plaintiffs apparently would require inclusion of more detailed technical data in the

---

**68.** The Sixth Circuit also recognized: *"Vermont Yankee* counsels that a significant factor in whether the specificity of an agency's examination of alternatives is an abuse of discretion is how meaningful was the participation in agency proceedings by intervenors." *Kentucky ex rel. Beshear, supra,* at 718. With respect to consideration of alternatives, the only identifiable input by any plaintiff was by virtue of membership in Citizens for Better Neighborhoods (CBN). The FEIS considered the "CBN Alternative" along with others submitted by interested individuals and groups. For present purposes, the most notable aspect of the CBN alternative is that it would have included plans for substantial improvements in crosstown street segments, although the extent of the improvements in terms of segment length would not have been as great as under the "no build" alternative. In view of foregoing discussion regarding historic properties, it might also be relevant to point out that this alternative would have included construction on segments that cross Granny White Pike in no less than two different places.

**69.** Apparently, plaintiffs would rely upon the court's expertise in this area and would allow the court to determine whether the data, assumptions, and conclusions in the EIS are technically accurate. The court is gifted with no special expertise that would enable it to accept such an invitation. In any event, as to whether particular decisions should have been made by the responsible agencies, the court expresses no opinion. In this as in other areas, the extent to which the court should play Monday morning quarterback is limited. *See, e. g., Vermont Yankee, supra,* 435 U.S. at 547, 98 S.Ct. at 1213, 55 L.Ed.2d at 481.

EIS. Nevertheless, the court is aware of no requirement imposed by NEPA that would call for reproduction of the entire administrative record in the EIS and plaintiffs point to no relevant data that defendants failed to consider. An unwieldy order indeed would issue should the court have defendants enlarge the EIS merely upon the basis of the allegations entertained here. Plaintiffs hint at no gain to be derived in that event, unless delay for its own sake should qualify as such. Even if it should be assumed that a mistake was made, absent a showing of possible significance no relief would be appropriate. *See Vermont Yankee, supra,* 435 U.S. at 553, 98 S.Ct. at 1216, 55 L.Ed.2d at 485. Quite simply, NEPA "does not require perfection, nor the impossible." *Environmental Defense Fund v. TVA,* 492 F.2d 466, 468 n.1 (6th Cir. 1974).

## C. Air Quality

It is asserted that the impact of I–440 upon air quality has been inadequately addressed in the EIS and has not been properly considered by the responsible agencies. The most gentle statement that can be made in response is that plaintiffs' arguments to this effect are distortions of the record.

Plaintiffs point to admissions in the FEIS that possible violations of the National Ambient Air Quality Standards may occur in the future. They neglect to mention that the two projected violations are deemed slight, particularly when compared to projections of widespread violations if I–440 is not built. Plaintiffs point to the fact that EPA requested recalculations of certain air quality predictions on two separate occasions, but they neglect to mention that the recalculations did not yield results significantly different from those previously obtained and that EPA expressly indicated that all of its comments had been satisfactorily addressed. Plaintiffs point to Paul Bontrager's complaint that he could not make a determination of consistency between plans for I–440 and the SIP based upon the information contained in the EIS, but they neglect to mention Bontrager's statement that there is no need for a determination of consistency. Also on the basis of Bontrager's testimony, plaintiffs attempt to raise the phantasm that I–440 will jeopardize approval of the SIP by EPA, despite the fact that EPA has scrutinized the I–440 project already and expressed satisfaction with the treatment of air quality predictions in the EIS. The court finds that the discussion of air quality in the FEIS is quite extensive and adequate.[70]

## D. Noise.

It is alleged that the EIS fails to adequately address potential noise pollution emanating from I–440. Having produced neither documentary evidence nor even purported expert testimony on this subject, plaintiffs assert that the FEIS itself discloses a failure to comply with applicable standards. Existing noise levels were measured at 176 separate locations along the I–440 corridor, and it appears that based on these readings several hundred noise level predictions were made through the use of an

70. Plaintiffs have alluded to the possibility that examination of defendants' conduct or the EIS itself might disclose violations of the Clean Air Act, 42 U.S.C. § 7401 *et seq.* The FEIS clearly includes the finding by responsible officials that the I–440 project is consistent with the SIP. This finding is supported by the discussion of projected air quality effects and by studies conducted both before and after completion of the FEIS in cooperation with EPA and other agencies. At no time has EPA or any other agency found that the project would be inconsistent with the SIP, and plaintiffs adduced at trial no evidence supporting a contrary presumption. The SIP includes the I–440 project, and as an element in the overall plan I–440 is expected to enhance the air quality in surrounding areas by allowing traffic to move more freely in the future. Thus, one of the major objectives of the Clean Air Act is expected to be furthered by completion of I–440. It is by no means clear that plaintiffs have complied with the notice requirements set forth in 42 U.S.C. § 7604(b) in such a manner that a claim under the Clean Air Act should be entertained; nevertheless, it *is* clear that plaintiffs have failed to identify and support in this action any violation of the Clean Air Act that would justify further inquiry.

approved computer model.[71] Extensive discussion and noise isopleth diagrams accompany the presentation of assembled data. The court perceives no basis upon which to doubt the reliability of the conclusions and analysis, which include rather detailed consideration of noise abatement measures. Examination of the procedures utilized and the calculations produced discloses no violation of applicable guidelines.

Plaintiffs suggest that defendants have run afoul of the Noise Control Act, 42 U.S.C. § 4901 *et seq.* Initially, the court's reaction is that the Act appears to set forth no specific standard applicable to this case at all.[72] Were the court inclined to assume that appropriate notice was given prior to commencement of suit under the Act,[73] it would nevertheless be unable to identify any legitimate claim asserted here by plaintiffs. At most, the Act requires generally that the federal defendants "carry out the programs within their control in such a manner as to further the policy declared in section 4901(b)," and "comply with Federal, State, interstate, and local requirements respecting control and abatement of environmental noise." 42 U.S.C. § 4903(a), (b). Section 4901(b) expresses the need "to promote an environment for all Americans free from noise that jeopardizes their health or welfare." 42 U.S.C. § 4901(b). However extensive defendants' obligations might be under these provisions, the court must conclude that plaintiffs' vague allegations disclose no merit. There is absolutely no evidence that actions taken heretofore or contemplated by defendants violate any applicable regulation, and certainly there is no basis upon which it can be said that defendants threaten the public health or welfare.

Plaintiffs recognize that certain noise control standards have been promulgated pursuant to 23 U.S.C. § 109(i), *see* 23 C.F.R. § 772.1–.25, and that projects must either be approved under these regulations or else excepted from their coverage.[74] As a part of their attack upon the FEIS plaintiffs cite these regulations in an authoritative manner, but why they do so is a mystery. By arguing that compliance with these regulations must be apparent in the FEIS, plaintiffs would leap a chasm over which there is no bridge. Section 109 sets forth and authorizes the promulgation of standards to be met prior to approval of "plans and specifications for proposed projects." 23 U.S.C. § 109(a). This approval process is commonly referred to as PS&E [75] approval, and may be characterized as the final "hurdle" to be crossed before federal funds are released so that construction may begin.[76] Although the procedural steps are somewhat confusing, it is clear that defendants simply did not reach this "hurdle" and were not required to reach it prior to completion of the FEIS.[77] PS&E approval had been given prior to trial of this cause for only the segment of I–440 between I–65 and Glen-

---

**71.** The court may be guilty of oversimplifying the technical nature of this process to some extent by concluding that it appears to be very similar to the process by which air quality calculations were prepared. *See* note 7 *supra* and accompanying text. Nevertheless, it does not appear that consideration of the issues presented requires any greater understanding than that which can be derived from the record as a whole.

**72.** In particular, the court would note that all of the acts prohibited in section 4909 and the Act as a whole apparently relate only to the maintenance or use of "products in commerce."

**73.** *See* 42 U.S.C. § 4911(b).

**74.** Presumably some projects are or have been exempt due to the fact that the regulations are not applied retroactively. *See* 23 C.F.R. § 772.-

7. Also, in particular cases exceptions might be approved by FHWA. *See* C.F.R. § 772.15.

**75.** I. e., plans specifications, and estimates. *See* 23 U.S.C. § 106(a).

**76.** As might be expected, there is, in addition, a technical requirement for "completion of a project in accordance with the plans and specifications," 23 U.S.C. § 121(b), prior to the final payment of allocated federal funds.

**77.** PS&E approval is to be sought by state officials "as soon as practicable after program approval." 23 U.S.C. § 106(a). "Program approval" requires submission of "proposed projects," 23 U.S.C. § 105. For purposes relevant here, the obligation to prepare an EIS arose at least as early as this "proposed project" stage. *See* 42 U.S.C. § 4332(2)(C).

rose Avenue,[78] and thus the regulations cited by plaintiffs had become applicable only with respect to that segment.[79] The record discloses that the required Noise Study Report for the section between I–65 and Glenrose Avenue has been submitted by TDOT and was approved by FHWA on February 19, 1981. Further the court need not go save perhaps to comment that there is positively no basis upon which to suspect that any regulation whatsoever has been ignored or evaded.

Plaintiffs complain further that the economic impact of projected increases in noise levels upon neighborhoods in the I–440 area has not been adequately addressed. They object to consideration of such impact through a comparison of expected noise from I–440 with noise from "major urban arterial streets." They would, in other words, require that defendants ignore the fact that there presently exist "major urban arterial streets" carrying heavy loads of crosstown traffic and engage in an essentially fictionalized and theoretical inquiry.[80] It appears that when plaintiffs question whether certain factors were "given adequate consideration," they actually found their claims upon disagreement with the conclusions reached and decisions made. Whether such conclusions and decisions are wise and in the best interest of citizens

living in the vicinity of I–440 may be understandably of interest to plaintiffs, but upon those grounds the court should not and will not tread by substituting its judgment for that of the defendants and other responsible officials.

E.  Endangered Species

Plaintiffs contend that the FEIS fails to adequately consider the impact of I–440 upon federally protected endangered species such as the Tennessee Purple Coneflower and the Nashville Crayfish. They would assume that some unspecified impact is to be expected without any proof to this effect. Their contentions are puzzling, to say the least.

The FEIS discloses that two surveys of the I–440 right-of-way were conducted in order to ascertain whether any endangered plant species were present there. Botanists identified 126 species of plants in the project area. The Tennessee Purple Coneflower was not among those found, and it does not appear that any of the species that were identified are "endangered." Plaintiffs have referred to the second study and, because it was conducted during November 1978, complain that it "raises a serious question as to the adequacy of the study" due to the time of year.[81] It is true that the

---

78. The parties indicated that either construction or preparation for construction had begun on this section of highway prior to trial. Pursuant to the understanding that defendants proceed with such activity at "their own risk," plaintiffs have not sought preliminary injunctive relief.

79. As to possible actions (such as applying for PS&E approval) with respect to other segments that might have been taken subsequent to the date of trial, the court has no knowledge and, of course, expresses no opinion. Nevertheless, the court would note that the FEIS contains most if not all of the data that will be needed in order to comply with Part 772 of 23 C.F.R. and that federal defendants have in their brief assured the court that PS&E approval will not be granted for future construction prior to full compliance with those regulations. There is no reason at this time to presume that compliance cannot be expected.

80. In essence, plaintiffs merely present restructured contentions similar to those addressed

elsewhere that are based upon disagreement with the perception that crosstown routes need to be improved. As presented, however, their argument regarding noise impact would also take no account of the fact that regardless of whether I–440 or any other facility is built, and regardless of whether any improvements in existing facilities are made, the corridor area *is* traversed by major crosstown arteries. The FEIS indicates that basic figures were obtained from 176 noise level readings actually taken on the right-of-way. Regardless of where the noise came from that showed up in those readings, it certainly did not come from I–440 or any other nonexistent facility. To the extent that conclusions in the FEIS are based on additional assumptions or projections their use is made known. There is simply no evidence of deception, and the methodologies used are not questioned here.

81. The Tennessee Purple Coneflower itself apparently would not be visible at this time of year. Nevertheless, the experts who conducted

University of Tennessee botanists who conducted the November survey noted that "to be absolutely certain that [no endangered species] occur along the study area, surveys would have to be made in early to late spring." Plaintiffs totally neglect to mention the fact that a survey conducted by a TDOT staff botanist during the *spring* of 1978 also failed to disclose the presence of any endangered plant species in the study area; thus, the alleged "serious question" may be seen only if one is willing to view the facts quite selectively. The court finds that the consideration of endangered plant species in the FEIS, based upon two surveys of the project area, is in no sense inadequate.[82]

The FEIS contains extensive discussion regarding the potential impact of the I–440 project upon aquatic habitats and water quality. Plaintiffs point out no respect in which either this discussion or the surveys and research which support it are deficient. The court finds no deficiency. No evidence whatsoever suggests that this project threatens the existence of the Nashville Crayfish.

Plaintiffs offered no testimony or other evidence that would tend to show that either species identified in their complaint

may actually be found on or near the right-of-way. Middle Tennessee is said to include habitat suitable for the Tennessee Purple Coneflower, and Mill Creek has been known in the past to shelter the Nashville Crayfish, but further than this one cannot go on the basis of the record in this case. To state a fact bluntly, there is no more proof that either species is threatened by I–440 than there is proof that the Humpback Whale is threatened by the project, and a ruling in plaintiffs' favor concerning the latter would make practically as much sense as the ruling they seek regarding the former. Although consideration of this fact may at most bear indirectly upon the question whether the FEIS is adequate,[83] it may go a long way toward obviating the need to delve further into the Endangered Species Act.[84]

### F. Transportation of Hazardous Materials

Testimony was introduced at trial to the effect that the FEIS might fail to properly address the issue of hazardous waste transportation. Passing lightly over the somewhat unimpressive credentials offered in support of plaintiffs' "expert" witness on this point,[85] the court would merely state that consideration of hazardous materials

the November survey reported that no habitat appropriate for the species was observed on the right-of-way, and that the plant would not therefore be expected to grow in the study area.

**82.** Plaintiffs have made other allegations, for example, to the effect that the two UT botanists did not conduct a "systematic survey" and collect specimens throughout their tour of the right-of-way. They neither comment upon nor challenge the fact, clearly disclosed in the FEIS, that the TDOT botanist collected numerous specimens during his survey. In all respects it appears that plaintiffs' questions are answered by an examination of the FEIS as a whole, notwithstanding the fact that disjointed consideration of particular sections might yield different answers to those questions.

**83.** This is so because even discovery of the Purple Coneflower on the right-of-way would not compel a finding that the FEIS was inadequate, although it would show that a mistaken conclusion was drawn. Probably no EIS is ever completely free of inaccuracy. Perfection can hardly be required despite the fact that it

may be presumed in the absence of proof suggesting the contrary.

**84.** See 16 U.S.C. § 1531 *et seq.* It does not appear that plaintiffs have satisfied relevant notice requirements, see 16 U.S.C. § 1540(g)(2), but again a total lack of substantive merit precludes the need for more detailed inquiry regarding the claim asserted. See note 70 *supra*; note 73 *supra* and accompanying text.

**85.** Paul Allen, who testified in plaintiffs' behalf, is essentially a public relations representative or press officer, although he has apparently undertaken additional responsibilities in related areas during his past employment by TDOT and in his present job with the Public Service Commission. His sole qualifications as an expert on hazardous materials transportation, according to his testimony, are that he has "read a lot of literature" and apparently has discussed this topic with a Public Service Commission employee who is "one of the best specialists available" and who "trains the experts" in this field.

transportation in the FEIS appears to be more than adequate. Among other factors, safety features inherent in the design of the project are discussed. Absolutely no deficiency is apparent. In *Kentucky ex rel. Beshear* the court addressed the handling of potentially sensitive materials within a river port by stating that "[t]he final EIS considers the environmental impact of 'the port'—it does not state the environmental impact of each item the port will handle." *Kentucky ex rel. Beshear, supra*, at 721. The quoted passage provides, if anything, much more insight regarding this issue than would be needed to dispose of plaintiffs' claim here. To the extent that the testimony of plaintiffs' witness raises questions regarding the handling of hazardous materials on the highways of this state those questions are consignable to the Tennessee General Assembly and perhaps the Public Service Commission, but certainly not to defendants under the aegis of this litigation.

## VIII. PUBLIC HEARINGS

Plaintiffs complain along various lines that the public hearings conducted between 1957 and 1978 have not been held in compliance with the law. Their claims disclose no merit.

Plaintiffs point to approval of general route locations on September 23, 1955, as evidence of bias and as a violation of 23 U.S.C. § 128. A quite simple fact that plaintiffs fail to emphasize is that key portions of section 128 to which they refer were not passed until on or after June 29, 1956. It is also alleged that actions taken during and after 1955 contravene 23 C.F.R.

§ 790. The portions of that regulation to which plaintiffs refer apparently were not promulgated before 1974. In other words, plaintiffs embark upon an approach that the court has rejected elsewhere and rejects here—the tangling of defendants in a sharply devised network of retroactive prohibitions and requirements.[86] Pointing discretely to public hearings held in 1957, 1968, 1969, and 1978, plaintiffs selectively offer up perceived violations of various standards. The court, taking no part in such gamesmanship, concludes that the hearings as a body comply in every respect with the law and regulations presently effective, and further that each hearing *at the time it was held* comported in all material respects with standards then in force.

Interested citizens have been availed of a public forum on no less than four occasions over a period of approximately 21 years in which they were allowed to ask questions and express any opinions, objections, suggestions, or complaints regarding I–440.[87] It is alleged nevertheless that plaintiff Robert Bird and possibly others were denied the opportunity to speak. Examination of the facts discloses that such a claim, however lacking it might be in other respects, certainly lacks naught for audacity. The only evidence offered was ostensibly in support of a claim that Bird's rights were denied, and thus the facts will be examined in that context.

No evidence was offered regarding Mr. Bird's interest in speaking at the 1955 hearing, the 1968 hearing, or the 1969 hearing. Indeed, no complaint is heard regarding the first 2 days of the 1978 hearing, or even the first half of the third day. The claim that

---

**86.** *See, e. g., Hopewell Township Citizens I–95 Comm. v. Volpe*, 482 F.2d 376 (3d Cir. 1973); *Concerned Citizens of Marlboro v. Volpe*, 459 F.2d 332 (3d Cir. 1972); *Movement Against Destruction v. Volpe*, 361 F.Supp. 1360 (D.Md. 1973), *aff'd*, 500 F.2d 29 (4th Cir. 1974); *Citizens for Mass Transit Against Freeways v. Brinegar*, 357 F.Supp. 1269 (D.Ariz.1973); *Elliot v. Volpe*, 328 F.Supp. 831 (D.Mass.1971).

If the court would otherwise be willing to apply the standards asserted by plaintiffs retroactively, defendants' argument based upon the doctrine of laches would be quite persuasive.

*See, e. g., Citizens for Mass Transit Against Freeways v. Brinegar*, 357 F.Supp. 1269, 1276 (D.Ariz.1973).

**87.** It may be recalled that five more informal neighborhood workshops were held during which citizens were invited *inter alia* to submit completed questionnaires and discuss the project. Also, one of the four hearings was divided into three daylong sessions, and pursuant to the hearing procedures, written comments of unlimited length from interested citizens were solicited.

Bird was wrongfully deprived of his right to speak rests solely upon the fact that he was not able to show up during the middle of the third day and be heard precisely *when* he wanted and *how* he wanted to be heard. A closer look at the 3-day affair reveals the ludicrous nature of Bird's complaint.

On the morning of Friday, October 13, 1978, the hearing began with more or less formal statements by various officials. Following those statements, the floor was opened for comments and questions from those attending the session. Plaintiff Eugene TeSelle was present and was allowed to ask at least one question. Carroll Bourg, a witness for plaintiffs at trial, was allowed to speak on at least three separate occasions. Both were heard simply by being present and seeking to be recognized. At one point during the morning the moderator commented, "We've got a lot of people out there. Surely somebody else has got a question. I don't see any hands yet . . . Let's take a small break and someone may determine he has a question." This and other statements by the moderator indicate that *any* interested person could have spoken. During the afternoon session on Friday, those who simply appeared on that day and signed a list were allowed to speak on any matter they might desire to address. Again Carroll Bourg spoke, and plaintiff Walter Searcy spoke also. Plaintiff Searcy was not on the sign-up list, but he was allowed to speak anyway after all of those on the list had been given an opportunity. After Searcy spoke, two other individuals spoke briefly. The final entry in the hearing transcript for Friday afternoon indicates, in the moderator's words, the following:

Is there anybody else who signed up? Paul, is there anybody else signed up? No one is signed up, so if you want to speak, come right on up and we'll let you speak. Anybody want to speak? Well, if nobody wants to speak, I guess we'll turn the machines off and wait until somebody comes in that does. We're supposed to stay here until 5:30 before we take an hour break, so this would be a good time to say something. You can get in a little extra free time here if you want to.

These are hardly the words one might expect to hear from one intent upon arbitrarily denying the rights of citizens in a public hearing.

On Saturday, October 14, the hearing reconvened and ran throughout the day. Again all one was required to do in order to be heard was appear and sign a list. Plaintiff Eugene TeSelle spoke again during the morning session, and plaintiffs Dorothy Crowley, Charles Cole, and Patti George spoke during the afternoon. At the end of this session the moderator indicated that all of the people on the sign-up list had been recognized. He then stated, "Is there anyone else here who wishes to make a comment before we adjourn? If not, we'll adjourn to the Monday Session. Those time slots have been made by appointment."

Not until Monday morning, October 16, 1978, did Robert Bird decide that he was interested in attending the public hearing. He appeared at the hearing room at midday on the only day for which a list was set up by appointment and demanded that he be allowed to speak. When he learned that he would not be allowed to break the hearing format at his own pleasure,[88] he passed

**88.** In accordance with the practice followed on the 2 preceding days of the hearing, the moderator was willing to allow unscheduled speakers to take the floor on Monday, but only when no speaker with an appointment was available. The final session was scheduled to end at 5 P.M. The hearing transcript indicates that when the last individual who had an appointment finished speaking, the time was "right on five o'clock." Earlier that afternoon the moderator noted at one point that some extra time was available for individuals who had ex-

pressed an interest in speaking. Among those whose names were called but who were no longer present was plaintiff Charles Cole. Robert Bird was apparently no longer present at that time, either. In any event, the available time was allotted to an individual who was present and who had expressed a desire to speak. It might be noted incidentally that the lady allowed to speak at that point was "totally opposed" to I-440. Thus, if the hearing format was devised as part of a conspiracy to foreclose opponents of the highway from speaking, the

some of his remarks along to a friend who had an appointment to speak. She incorporated at least some of these remarks into her speech.

Hundreds of pages of written comments both from individuals who spoke at the hearing and from those who did not speak were received, bound, and published by TDOT officials. Those officials made clear in announcements prior to the hearing and at the hearing itself that written comments would be accorded equal weight along with oral statements. Robert Bird did not choose to be heard in that fashion, however. Instead, he, along with others, chose to raise an utterly frivolous claim in a court of law. Certainly no one denied Bird or anyone else the opportunity to express an opinion.

Plaintiffs complain that defendants failed to prepare a "verbatim transcript" of public hearing statements and thus violated 23 C.F.R. § 790.7(c)(1). This contention is absurd. The only "statements" not recorded on the transcript were attempts by Bird and his cohorts to stand up in the audience during the hearing and demand recognition. A microphone was provided for all speakers who chose to appear in an orderly and appropriate fashion over the course of the 3-day affair, and every word spoken into the microphone was apparently recorded. The court finds that the procedures adopted for conducting the hearing were publicized well in advance and were in no sense inappropriate. Plaintiffs' outlandish claims should be dismissed.

Plaintiffs argue that new hearings should be held to reconsider the entire project and take into account various developments subsequent to the 1978 hearing. In support of this contention, 23 C.F.R. § 790.6(g) is cited. That regulation provides that an additional hearing should be held regarding a project "for which it is determined by the State

highway department and the Division Administrator [for FHWA] that a new hearing is desirable." 23 C.F.R. § 790.6(g). Plaintiffs would overlook the decisive points that no responsible official has made the requisite determination and that the failure to do so in this case represents in no respect an abuse of discretion. The argument that an additional hearing should be held therefore totally lacks support and deserves no further comment.

## IX. IMPACT UPON LOW–INCOME AND MINORITY INDIVIDUALS

█ Plaintiffs allege that I–440 will have the effect of blocking migration from the inner city and racially mixed neighborhoods into predominantly white middle or upper class neighborhoods, along with other discriminatory effects. No facts in support of this claim were introduced at trial; instead, plaintiffs rely upon mere generalized and conclusory statements that such a "barrier effect" will be produced.[89]

Kitty Smith testified on plaintiffs' behalf that I–440 would effectively bar access by white children to Sevier Park, so that black and white children could no longer play there together. Nevertheless, on cross-examination Mrs. Smith admitted that the only two streets crossing I–440 in that vicinity, Lealand Avenue and Granny White Pike, will still cross over the highway, and white children will have essentially the same access to the park that they presently have.

Plaintiffs portray the highway in various respects as an impenetrable breastwork not to be overcome by any traveler moving from north to south. In particular, they claim that certain neighborhoods will be separated in such a manner by I–440 that movement by minority individuals and others from one neighborhood to another will be totally frustrated. Perhaps the most

conspiracy failed miserably at this time, as it did at all other times.

**89.** The racial barrier argument pressed by plaintiffs is limited in scope to a contention that I–440 will result in certain impermissible discriminatory "effects." No allegation whatsoever is directed toward proof of *intent* on the part of any official or agency to bring about a discriminatory impact of any type. Plaintiffs have, in fact, assiduously avoided resting their claim upon such an untenable ground.

basic flaw in plaintiffs' argument is revealed upon consideration of the fact that all of the neighborhoods named by plaintiffs are located to the west of I–65, and project plans call for the closing of *no* streets that cross I–440 in that area. Were the court willing to conclude, as plaintiffs would apparently require, that migration from the inner city necessarily occurs in cross-country fashion over fields and through backyards rather than on established streets, then plaintiffs' argument might be more readily accepted.

That the line created on a map after plotting the highway route might be used in drawing school district or census study zones adds nothing to plaintiffs' cause; to the same extent this argument would prove that county lines and other lines of convenience found on maps represent "barriers." The lack of connection between school district lines and the existence of a physical barrier is also illustrated by the fact that the school district to which plaintiffs point was drawn before any construction had taken place along the I–440 corridor. Furthermore, if the I–440 project had never been conceived, the Tennessee Central Railroad right-of-way would delineate substantially the same "barrier." Thus, plaintiffs' argument may be seen to rely heavily upon the logical fallacy *post hoc ergo propter hoc.*

Through no small amount of distortion, plaintiffs would have the court declare on the basis of 49 C.F.R. § 21.5(b)(7) that the FEIS is fatally defective because it fails to outline an affirmative action plan. Plaintiffs have neglected to enlighten the court regarding how this regulation calling for affirmative *action* under certain circumstances requires the formulation of a written and published "plan," much less how such a plan formulated pursuant to regulations designed to effectuate Title VI of the Civil Rights Act of 1964 came to be required material in an EIS. There is absolutely no hint within or without the FEIS that defendants have been guilty of discriminatory action in the past or that they plan discriminatory action in the future. I–440 and the plans therefor entail absolutely no detrimental impact that will befall any individual due to his race, color, national origin, or economic circumstance. Plaintiffs neither allege nor offer to prove that defendants have failed or will fail to act in a manner entirely consistent with the cited regulation other than by the assertion that no "plan" is outlined in the FEIS. Be it due to lack of guidance from plaintiffs or some other factor, the court must admit that it is confounded by this claim.

## X. "3–C" PLANNING

Plaintiffs range far and wide to gather allegations upon which to base a claim that defendants have failed to engage in the continuing, comprehensive, and cooperative (3–C) planning process called for by 23 U.S.C. § 134(a). This package of claims must be viewed in substance as a charge that the Secretary of Transportation has abused his discretion by approving the I–440 project. *See* 23 U.S.C. § 134.

As a part of their claim that insufficient long-range planning has been undertaken, plaintiffs decry the fact that I–440 has been planned for several years and that when the interchange on I–440 at Granny White Pike was deleted from project plans, an interchange at Armory Drive on I–65 was proposed in order to serve traffic needs in the One Hundred Oaks-Melrose area.[90] In effect, plaintiffs would pick out trees one by one while vehemently denying that a forest exists. The I–440 project is and has been for sometime a *part*, however large or small, of the overall plan developed to meet traffic needs in Nashville and Davidson County. Likewise, although plans for one interchange on I–440 were dropped, perception of a need to provide access to the One

---

**90.** Plans for the Granny White interchange were abandoned in large part, if not solely, due to concern regarding the impact of I–440 upon the pike as an historic property, although the most convenient method for handling the problem of access to One Hundred Oaks Mall might well have been to proceed with building that interchange while other construction was underway on that site. This fact alone indicates that no single consideration has dominated the planning process.

Hundred Oaks-Melrose area yielded plans for alteration of the overall plan in another sphere by adding an interchange to I-65.[91]

For the most part, plaintiffs' argument regarding the 3-C planning process merely resurrects straw men encountered elsewhere in this memorandum. The circumstances surrounding the demise of each need not be recounted here in detail. In other respects, it appears that plaintiffs would challenge the ongoing 3-C process for all of the greater metropolitan area, notwithstanding the fact that the evidence they have produced bears, if at all, upon the 3-C process only insofar as it relates to I-440. Plaintiffs have failed to allege any act or omission remotely supporting a finding that the Secretary of Transportation has in an arbitrary manner or otherwise neglected the responsibility imposed upon him by 23 U.S.C. § 134.

## XI. CONCLUSION

Perhaps as important as a statement outlining what the court here decides is a brief delineation of the areas into which the court does not venture. Throughout the pendency of this litigation there has hovered an often thinly veiled and easily detectable invitation to determine once and for all whether it is wise to proceed with construction of I-440, whether I-440 as designed is needed, and various other related matters. Lest there be doubt, the court at this point would expressly decline any such invitation. The court has not peered over the shoulders of responsible officials and experts with an intent to recalculate and predict anew the precise future impact of this project in terms of air quality, noise levels, or plant and animal life. These and similar functions have been and continue to be within the responsibility of other agencies and branches of government. The court has looked carefully, but only to see whether the responsibility was and is being undertaken in proper fashion.

It is perfectly obvious that plaintiffs disagree with the proposition that I-440 should be built. Upon careful review of the record in this case, the court deems itself compelled to hold nevertheless that, however much they might question the wisdom underlying the decision to build this highway, plaintiffs have in the final analysis failed to allege and support grounds that would justify preventing or further delaying completion of the project. Whether the court subjectively agrees with the decision that I-440 should be constructed or would make the same decision is completely irrelevant, for in any event "[a]dministrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, [and] not simply because the court is unhappy with the result reached." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460, 488 (1978). It might be added that unhappiness on plaintiffs' part with the result reached would form no perceptibly stronger foundation for a ruling in this case.

Plaintiffs have carefully watched over and indeed participated to some extent in the administrative process that yielded a decision to complete the I-440 project. When governmental agencies, individual citizens, or groups of citizens made suggestions or voiced concerns regarding consideration of alternatives, noise levels, air quality, historic properties, and various other factors, the responsible officials listened and responded appropriately. Plaintiffs have raised no relevant consideration that did not enter into the decisionmaking process. The prevailing theme that arises from examination of the record in this case is that the administrative process has functioned properly. The system has worked.

**91.** There does not appear to be any real question regarding whether defendants have acted appropriately by not including a detailed analysis of plans for the Armory Drive interchange in the FEIS for I-440. In any event, no evidence suggests that the FEIS is deficient in this respect. To the extent that the record discloses the existence of specific plans for that interchange, it appears to be a project quite separate and apart from I-440.

For all of the foregoing reasons the court has determined that this cause should be dismissed in its entirety. An appropriate order will be entered.